# United States Tax Court

T.C. Memo. 2025-97

VINCENT J. FUMO,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

_____

Docket Nos. 17603-13, 17614-13.                 Filed September 24, 2025.

_____

*Mark E. Cedrone*, for petitioner.

*Jeannine A. Zabrenski, Roman M. Olchowecky, Harry J. Negro, Noelle White, Timothy R. Prosky, Kristina L. Rico, Laura A. Price, Timothy J. Driscoll*, and *Jordan D. Kohl*, for respondent in docket No. 17603-13.

*Timothy R. Prosky, Kristina L. Rico, Laura A. Price, Timothy J. Driscoll, Patricia P. Wang*, and *Jordan D. Kohl*, for respondent in docket No. 17614-13.

## TABLE OF CONTENTS

MEMORANDUM FINDINGS OF FACT AND OPINION ..................... 4

FINDINGS OF FACT ........................................................................ 7

I.      Petitioner's Background................................................... 7

II.     Creation of Citizens Alliance ......................................... 8

III.    Petitioner's Properties.................................................. 10

        A.      Philadelphia Residence .................................... 10

        B.      New Jersey Properties...................................... 11

        C.      Riverview Farm ................................................ 11

**Served 09/24/25**

**[*2]** D.     Florida Properties ............................................................ 12

       E.     Martha's Vineyard ........................................................ 13

IV.    Petitioner's Offices and Staff Structure ................................... 13

       A.     Philadelphia Senate Office ............................................. 13

       B.     Citizens Alliance ............................................................ 15

       C.     Harrisburg Senate Office ............................................... 16

             1.      General Support Staff ........................................... 16

             2.      Senate Democratic Appropriations Committee ............................................................. 21

             3.      Senate Democratic Computer Services Committee ............................................................. 21

       D.     Senate Contractors ........................................................ 23

             1.      Private Investigator .............................................. 23

             2.      Political Campaign Consultants ........................... 23

             3.      "Ghost Contractors" ............................................ 25

       E.     Fumo for Senate ............................................................ 26

       F.     Other Personal Services ................................................ 27

V.     Activities of Citizens Alliance ................................................... 27

       A.     Travel to Cuba .............................................................. 28

       B.     Political Polling ............................................................. 29

       C.     Ventnor Dunes Project .................................................. 30

VI.    FBI Investigation .................................................................... 32

VII.   Criminal Trial ......................................................................... 33

VIII. IRS Civil Examination ........................................................... 34

**[*3]**

IX. Tax Court Proceedings ................................................. 36

OPINION ................................................................................. 38

I. Burden of Proof ......................................................... 38

II. Period of Limitations .................................................. 39

III. Unreported Income .................................................... 40

    A. Unreported Income from the Senate ............................ 42

        1. Excess Compensation Engineered by Petitioner ...................................... 43

        2. Personal Services Rendered to Petitioner ............. 46

        3. Senate Contractors ...................................... 57

    B. Unreported Income from Citizens Alliance ..................... 61

        1. Tools ..................................................... 61

        2. Consumer Goods ........................................... 62

        3. Farm Equipment ........................................... 63

        4. Cell Phone Expenses ...................................... 65

        5. Vehicles .................................................. 66

        6. Services Supplied by Citizens Alliance Staff ........ 68

        7. Citizens Alliance's Payments to Frank Wallace ........................................... 69

        8. Political Polling ........................................ 70

        9. Ventnor Dunes Project .................................... 71

        10. Travel to Cuba .......................................... 73

IV. Excise Tax Liability ................................................... 74

    A. Governing Statutory Structure ................................. 74

4

[*4]  B.  Period of Limitations ........................................................ 76

C.  Analysis ............................................................................ 77

1.  "Economic Benefits" .............................................. 78

2.  "Consideration Received" ....................................... 78

3.  Petitioner's Arguments .......................................... 80

V.  Penalties and Additions to Tax .................................................. 81

A.  Civil Fraud Penalty ........................................................... 81

1.  Supervisory Approval ............................................ 81

2.  Existence of Fraud ................................................ 82

B.  Additions to Tax for Failure to File ................................ 88

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, *Judge*:  In 1978 petitioner was elected a Pennsylvania state senator, representing the first district in Philadelphia.  After he was reelected many times, his tenure ended in 2008 when he was indicted on Federal criminal charges.  In March 2009 he was convicted on 137 counts including mail fraud, wire fraud, obstruction of justice, conspiracy to obstruct justice, and violation of section 7206(2) for willfully aiding or assisting in filing false tax returns.[1]  The principal victims of his fraud were the Pennsylvania State Senate (Senate) and Citizens Alliance for Better Neighborhoods (Citizens Alliance), an organization exempt from Federal income tax under section 501(a) and (c)(3).

The criminal proceedings lasted a long time, with two appeals to the U.S. Court of Appeals for the Third Circuit and multiple rulings by the U.S. District Court for the Eastern District of Pennsylvania.  When the dust settled, petitioner was sentenced to 61 months of prison and

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.  We round all monetary amounts to the nearest dollar.

**[\*5]** community service. The total loss to the Senate was calculated as $2,517,274, and petitioner was held to be responsible for 100% of that loss. The total loss to Citizens Alliance was ultimately calculated as $1,566,528, and petitioner was determined to be responsible for at least 75% of that loss.

After petitioner's convictions were affirmed on appeal, the Internal Revenue Service (IRS or respondent) commenced an examination concerning his civil tax liabilities. The audit was conducted by two teams, one focusing on income tax and the other on excise tax. The latter examination was based on section 4958, which imposes an excise tax on a "disqualified person" who engages in "excess benefit transaction[s]" with a charity. *See* § 4958(a)(1). In both examinations, the IRS revenue agents relied heavily on information compiled by the Federal Bureau of Investigation (FBI) that was introduced into evidence during the criminal case.

In May 2013 the IRS issued petitioner Notices of Deficiency for income tax and excise tax, and he timely petitioned this Court. In Docket No. 17603-13 the IRS determined income tax deficiencies for 2001–2005 plus a civil fraud penalty under section 6663(a) for each year. In Docket No. 17614-13 the IRS determined excise tax deficiencies for 2002–2004, on the theory that petitioner had engaged in excess benefit transactions with Citizens Alliance. In the excise tax case the IRS also determined additions to tax under section 6651(a)(1).

The IRS revised its initial determinations via Amended Answers and made certain concessions in the excise tax case. The amounts currently in dispute appear to be as follows:

| Year | Income Tax | § 6663(a) Penalty | Excise Tax | § 6651(a)(1) Addition to Tax |
|------|-----------|-------------------|------------|------------------------------|
| 2001 | $284,402 | $213,302 | – | – |
| 2002 | 337,647 | 253,235 | $63,649 | $15,912 |
| 2003 | 309,947 | 232,460 | 72,262 | 18,066 |
| 2004 | 168,803 | 126,602 | 6,209 | 1,552 |
| 2005 | 190,667 | 131,902 | – | – |

In the income tax case the IRS contends that petitioner extracted taxable benefits both from Citizens Alliance and from the Senate. The Citizens Alliance benefits, allegedly totaling $725,990 during 2001–2004, included personal services and physical property, chiefly

[*6] consumer goods, household items, and tools, that petitioner purchased using the charity's credit cards or cash. Petitioner also enjoyed personal use of the charity's assets, including cars, trucks, and farm equipment. Respondent seeks to tax petitioner on the value of such assets to the extent used, not only by him personally, but also by his family members, Senate staff, political contractors, and political allies.

The IRS contends that petitioner during 2001–2005 extracted $2,862,568 of taxable benefits from the Senate. These benefits fall into three general categories:

- Excess compensation that petitioner caused the Senate to pay his Senate staff. He achieved this diversion of funds by falsely certifying to the Senate (personally or through his chief of staff) that these employees (1) had job qualifications they did not possess or (2) would discharge official duties they did not discharge or lacked the ability to discharge properly.

- The value of services performed by petitioner's Senate staff that benefited him directly or indirectly. Direct benefits included services that staff performed for petitioner, his family members, his political campaigns, and women with whom he was romantically involved. Indirect benefits included personal services rendered to his acquaintances, his political allies, and political candidates whom he favored.

- The value of services performed by political consultants and contractors whom petitioner caused the Senate to hire, but who in reality worked largely or exclusively for him, his political campaigns, and his political allies.

Relying heavily on determinations made by the courts in the criminal case, respondent contends that some or all of the underpayments of tax required to be shown on petitioner's tax returns were "due to fraud." *See* § 6663(a). Respondent accordingly contends that petitioner is liable for 75% civil fraud penalties on the underpayments determined in the income tax case and that no period of limitations applies in either case. *See* § 6501(c)(1) ("In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed . . . at any time.").

By Order served February 28, 2020, we ruled that collateral estoppel would prevent petitioner from relitigating numerous facts that were indisputably litigated and resolved against him in the criminal case. But the criminal case did not determine, for Federal income tax

[*7] purposes, the amounts of gross income petitioner received during 2001–2005 or the excess benefits he extracted from Citizens Alliance. The principal issues we must decide concern the proper quantification of the taxable benefits petitioner received and the existence vel non of fraud.

FINDINGS OF FACT

The following facts are based on the parties' pleadings and Motion papers, seven Stipulations of Facts with attached Exhibits, and the testimony and documents admitted into evidence at trial. Included among the stipulated Exhibits is the complete transcript of petitioner's testimony from his criminal trial, as well as the transcripts of testimony from numerous other witnesses (some now deceased) who testified during the criminal case. Petitioner resided in Pennsylvania when his Petitions were timely filed. Absent stipulation to the contrary, appeal of these cases would lie to the Third Circuit. *See* § 7482(b)(1)(A).

I.    *Petitioner's Background*

Petitioner earned an undergraduate degree in biology from Villanova University, a law degree from Temple University, and a master's degree in business administration from the Wharton School. He embarked on a career in politics shortly after obtaining his law degree. He worked initially in the Pennsylvania state government and served as a "ward leader" in South Philadelphia. He was elected to the Senate in 1978, representing the first district of South Philadelphia.

Petitioner quickly rose through the ranks of Senate leadership. He first assumed an influential position on the Senate Democratic Appropriations Committee (SDAC). The Democratic caucus elected him chair of SDAC in 1984, and he held this position for the remainder of his Senate career. SDAC had responsibility for negotiating general and capital fund budgets and computing the fiscal impact of proposed legislation. During 2001–2005 SDAC itself had an annual budget of $4.9 million. Petitioner had authority to decide how those funds would be allocated, including for payment of salaries to his Senate staff.

As chair of SDAC petitioner occupied a top Senate leadership position. This entitled him to serve on the Committee on Management Operations (COMO). As a member of COMO petitioner helped set financial operating rules and employment policies for the Senate, including matters affecting staff payroll and employee leave time.

[*8]  Petitioner subsequently became head of the Senate Democratic Computer Services Committee (SDCS). This committee was responsible for purchasing computer equipment and providing information technology (IT) support to the Senate Democratic caucus, which consisted of roughly 21 members. Unique among the Senate offices that SDCS served, petitioner's office had its own dedicated email domain, fumo.com.

Petitioner developed deep roots in Philadelphia throughout his career. Early on he worked as a high school teacher, a criminal defense lawyer, and a licensing specialist for the State government. As his fame and fortune grew he served as counsel to Dilworth Paxson, a Philadelphia-based law firm, and as board chair of First Penn Bank, which had been founded by his grandfather. In both capacities he focused, not on day-to-day operations, but on high-level strategy and client generation.

Petitioner's community involvement included service on the boards of corporations and philanthropic groups in Philadelphia. He served as a board member or trustee of Independence Blue Cross, the Pennsylvania Higher Education Assistance Agency, the Delaware River Port Authority, and the Independence Seaport Museum. As explained in greater detail below, he was also the founder of Citizens Alliance, a charity that provided services to residents of the Senate district he represented.

Petitioner married twice. From his first marriage he has two children, Vincent E. Fumo and Nicole Fumo Marrone. When his first marriage ended in divorce he married Jane Scaccetti. The couple had one child, Allison (Allie) Fumo. Petitioner and Ms. Scaccetti divorced in December 2000. He dated Dorothy "Dottie" Egrie during 1999–2004 and later dated Terry Reilly. We will sometimes refer to them as his "girl-friends."

II.  *Creation of Citizens Alliance*

In 1991, at petitioner's direction, three members of his Senate staff incorporated the First District Environmental Defense Fund, which later became Citizens Alliance. As originally organized, its purpose was to maintain and improve the appearance of petitioner's Senate district by cleaning streets, removing graffiti, shoveling snow, carting away trash, and performing other services that benefited his constituents. In August 1999 the IRS issued a determination letter granting the

[*9] organization tax-exempt status under section 501(a) and (c)(3). Citizens Alliance maintained that status during the years at issue.

In 2001 Citizens Alliance created a wholly owned subsidiary, CA Holdings, Inc. (CA Holdings). Numerous subsidiary entities were later formed underneath it, including 1210 Enterprises, Inc., Hi Tech Ventures, Inc., Passyunk Avenue Revitalization, Inc., Moya Ventures, Inc., Pine Tree Realty, Inc., CA Real Property Six, Inc., and Eastern Leasing Corp. (Eastern Leasing). These subsidiaries, which had no employees, were created to hold title to various Citizens Alliance assets, which included real estate and automobiles. Petitioner created these subsidiaries as for-profit entities in part to avoid disclosure of their assets and income on Citizens Alliance's tax returns, which were open to public inspection. *See* § 501(c)(3).

Frank DiCicco, then a member of petitioner's Senate staff, was one of Citizens Alliance's incorporators and served as its president from 1991 through 1999. Ruth Arnao, another staff member, was also an incorporator. She initially served as secretary of the organization and during 2001–2004 was its executive director.

Petitioner himself was never an officer, director, trustee, or employee of Citizens Alliance or its subsidiaries. But he used his power and influence as SDAC chairman to obtain funding for the organization from a variety of public and private sources. During 1991–2004 he was instrumental in securing at least $15 million in public grants for Citizens Alliance and a comparable volume of funding from private sources.

During his criminal trial petitioner admitted that he "did have a significant role" in Citizens Alliance. While he "did not make all the decisions," he "did make a lot of decisions on important topics." As he explained: "I don't have a title or a job. Do I have influence? Yes." When asked by his defense attorney to describe his relationship with Citizens Alliance, he stated: "I viewed it as my non-profit. I viewed it as my entity, my baby. Gave it birth and nursed it along, got involved more with strategy and ideas. You know, that's how we viewed it. And we ran it out of our office." On cross-examination he testified similarly: "I created it. I helped it. I guided it. I gave it strategy. I gave it my time and effort. I raised money for it. If it weren't for me, it wouldn't exist."

The prosecutor during the criminal trial read to petitioner the definition of "disqualified person" as it appeared in the 2002 Instructions for Form 990 and Form 990–EZ, at 11: "A disqualified person, regarding

**[\*10]** any transaction, is any person who was in a position to exercise substantial influence over the affairs of the . . . organization at any time during a 5-year period ending on the date of the transaction." Petitioner replied: "I did have substantial influence over the organization. So according to that I am a disqualified person."

III.    *Petitioner's Properties*

Petitioner owned real property in Pennsylvania, New Jersey, and Florida, and he took annual vacations in Massachusetts. Significant portions of the goods and services he extracted from the Senate and from Citizens Alliance related to his residences and vacation destinations.

A.    *Philadelphia Residence*

Petitioner has called Philadelphia home for his entire life. He purchased a primary residence at 2220 Green Street (Green Street home) in 1994, and he resided there throughout the tax years at issue. The Green Street home was a stately 10,000-square-foot residence that included a basement and subbasement, three floors of living space, a deck, a backyard, a two-car garage, and a shooting range. It required renovations upon purchase, so petitioner and his family did not move in until 1998. The renovations were time-consuming, and petitioner instructed Senate staffer Christian Marrone to oversee renovations. *See infra* pp. 14–15.

Staff were a fixture at the Green Street home, coming and going as needed to assist with the vast number of personal requests petitioner directed to them. Senate staff ran errands, let contractors into the home, outfitted the home with technology, performed housekeeping duties, and planned and hosted political fundraising events. SDCS staff once reported to the home to address a problem relating to internet connectivity for laptops owned by Allie Fumo and one of petitioner's girlfriends, which took about 20 hours to resolve. Other technology-related requests involved installing a video game system in petitioner's home office and a cooling fan in his home entertainment cabinet. Another staff member was once required to report to the Green Street home during Senate work hours to label all light switches in the three-floor residence. Citizens Alliance staff likewise performed personal tasks, such as snow-removal services and decoration of the home for Christmas.

**[*11]** B.  *New Jersey Properties*

Petitioner owned two properties on the New Jersey shore: a home in Margate and an apartment building in Ventnor.  These are adjacent towns that share shoreline on the Absecon barrier island.  Petitioner's Margate home was close to the beach and had an ocean view.  His Ventnor building was on the bay.  The distance between the two properties was 2 miles, and both were 62 miles from Philadelphia.

Petitioner and his friends referred to the Ventnor property as "the docks" because it had water access by means of a dock.  Petitioner moored boats there and spent considerable time tinkering on his boats.  He rented out the five units in the Ventnor building, generally to friends and colleagues, including Ms. Arnao.  She purchased one of the Ventnor condominiums from him in 2001.

One of petitioner's hobbies was fixing things, and he was a devoted aficionado of tools and equipment.  During 2001–2005 he outfitted the garage next to Ms. Arnao's unit with a vast array of tools, which precisely matched the universe of tools amassed in his other residences.  Virtually all these tools were purchased at the expense of Citizens Alliance.  Petitioner spent much of his time at Ventnor working on his boats and making repairs to his beach properties.

Petitioner and Ms. Arnao regularly used the beach properties to entertain friends, campaign contributors, and political allies.  The entertaining during the summer consisted of weekly barbeques with approximately 20 guests and two major parties attended by about 100 people.  He and Ms. Arnao purchased supplies for these parties with shopping sprees at Sam's Club and other nearby retailers, typically financed at Citizens Alliance's expense.  Petitioner frequently arranged for Citizens Alliance staff, whose office was 62 miles away, to collect trash from his beach properties.

C.  *Riverview Farm*

Petitioner purchased Indian Springs Farm in Halifax, Pennsylvania, in January 2003.  He renamed the property Riverview Farm, which he held through a limited liability company.  The farm was conveniently located near Harrisburg, where petitioner maintained his office in the Pennsylvania State Capitol.

When he acquired Riverview Farm, it included a farmhouse, a guest house, and a storage barn, all in a state of disrepair.  He renovated

[*12] the existing structures and added three additional barns, a carpentry workspace, a skeet shooting range, and a pond. Once the renovations to the main house were substantially complete, he resided at the farm when the Senate was in session.

The improvements to Riverview Farm required a great deal of earthmoving and construction equipment. For this purpose petitioner again enlisted the assets and staff of Citizens Alliance. He arranged for its employees to transport various pieces of equipment from Philadelphia to the farm, including lawn mowers, a backhoe, Bobcat construction equipment, a dump truck, and Polaris all-terrain vehicles (ATVs). Some of this equipment remained on the farm essentially full time. Other items were shuttled back and forth between Harrisburg and Philadelphia as needed.

For day-to-day management of the farm, including supervision of construction, petitioner enlisted staff from his Harrisburg Senate office. Numerous Senate employees participated in the farm's management, in great ways and small. One Senate staffer and his wife lived on the farm full time for a period.

D.  *Florida Properties*

Petitioner owned vacation homes in Florida. He purchased a beachfront property on Jupiter Island in 1994, which he held until December 2006. In early 2005 he bought a home in Fort Lauderdale. When visiting these properties, he was often accompanied by Ms. Arnao, her husband, and Ms. Egrie, with whom he was then romantically involved.

The Jupiter Island residence included a garage that housed his extensive tool collection and other equipment. On the roof he mounted sophisticated weather-forecasting equipment, which included software that needed constant attention. Both homes had pools and home offices, which petitioner caused to be outfitted with Senate computer equipment.

Petitioner visited his Florida properties primarily in the Winter while the Senate was not in session. Senate staff frequently made his and Ms. Egrie's travel arrangements, which he often changed at the last minute. His drivers, who were paid by the Senate, regularly chauffeured Ms. Egrie to and from the airport in Philadelphia.

While in Florida petitioner needed many items, both Senate- and personal-related, and he arranged for these items to be shipped to him

[*13] using a Federal Express account paid by the Senate. Staff obliged and shipped a myriad of items, ranging from hairspray to a Weber grill. When petitioner was out of town, he assigned Senate staff to take care of his personal business matters in Philadelphia.

### E. *Martha's Vineyard*

Petitioner enjoyed regular vacations in Martha's Vineyard, Massachusetts. He typically took a 2-week trip to the island every August, inviting friends, family, political allies, and others to join. Courtesy of a friend, petitioner and his guests were usually transported to the island by private jet.

In connection with these trips, members of petitioner's Senate staff shuttled, by car from Philadelphia, luggage, computer equipment, and other items that could not fit into the private jet. Two or three cars were often needed to haul these items. Senate staff devoted numerous hours to configuring computer and wireless networks for petitioner in Martha's Vineyard and making vacation arrangements for him and his guests, including restaurant reservations and yacht trips. Petitioner enjoyed these yacht trips, sometimes week long, which he arranged by exploiting his board membership on the Independence Seaport Museum.

## IV. *Petitioner's Offices and Staff Structure*

Petitioner's staff structure defies easy characterization: He did not religiously adhere to conventional job classifications, and many staff members wore multiple hats. In theory he had four business-related offices—his Philadelphia Senate office, his Harrisburg Senate office, Citizens Alliance, and Fumo for Senate (his primary political campaign entity). But employees routinely divided their time among these organizations without differentiating between tasks performed for petitioner in his official and personal capacities. Regardless of their roles, staff members were required to follow petitioner's directives without question. He expected them to be at his beck and call, no matter the time of day or night. No one was allowed to leave the office at day's end before he did.

### A. *Philadelphia Senate Office*

Petitioner's principal Senate office in South Philadelphia was housed at 1208 Tasker Street. He operated a satellite office at Eighth and Clearfield Streets. That office was staffed by four people, including his Senate-paid housekeeper.

[*14] The district office occupied the first floor and basement of 1208 Tasker. Fumo for Senate, petitioner's campaign organization, was on the second floor. Senior employees (including petitioner when in town) worked in the basement. The constituent services arm operated out of the first floor.

Charlie Hoffman served as chief of staff for the district office during 2001–2005. Ms. Arnao rose through the ranks from secretary to become deputy chief of staff. In many ways she functioned as the linchpin of petitioner's multifaceted political operation. She served as his confidante, accompanied him on his travels, purchased beach property adjoining his, and ultimately became his codefendant in the criminal case.

Ms. Arnao's principal salary was paid by the Senate, but she also served as executive director of Citizens Alliance, in which capacity she received a salary and supervised its staff. Before terminating her Senate employment in 2004, she devoted numerous hours to political campaign activities and to other tasks that benefited petitioner personally. She married Mitchell Rubin in 2005, one of the political consultants petitioner hired as a "ghost contractor" for the Senate.

The district office employed two receptionists, Maria Powers and Gaetana "Gay" Secreto. Tracy D'Alonzo, Edward Hanlon, and Jonathan Rowan led constituent services. The following senior staff worked from the basement: Roseanne Pauciello, Gina Novelli, Lillian Cozzo, Mr. DiCicco, Maryann Quartullo, Jamie Spagna, and Janine Travelina. Senior staff members devoted many hours to work that benefited petitioner's political campaigns, Citizens Alliance, and petitioner personally.

Unlike other members of the Senate and against Senate policy, petitioner put his personal drivers on the Senate payroll. He had two chauffeurs in Philadelphia: Louis (Lou) Leonetti and David Nelson. Apart from official duties, they ran countless personal errands for him and his family members. These included buying groceries, picking up dry cleaning, shuttling items to Martha's Vineyard and the New Jersey shore, securing Christmas decorations for his home, running errands for his girlfriends, and driving his youngest daughter to and from school.

Mr. Marrone joined petitioner's district office staff as an intern upon graduating from college in 1997. Mr. Marrone ultimately became petitioner's son-in-law, marrying Nicole Fumo in March 2003. As directed by petitioner, Mr. Marrone performed numerous tasks unrelated to his Senate job, including significant work relating to petitioner's

[*15] political campaigns. One of his major projects was supervising the renovation and remodeling of petitioner's Green Street home. He maintained responsibility for such matters until he left Senate employment in August 2002.

Petitioner's closest political ally, Mr. DiCicco, worked in the district office until he was elected to the Philadelphia City Council sometime before 2001. His son, Christian DiCicco, assumed Mr. Marrone's position in 2002 when the latter terminated his Senate employment. Petitioner provided Mr. DiCicco with personal benefits at Senate and Citizens Alliance expense, including use of vehicles, assistance with Mr. DiCicco's political campaigns, weekly campaign accounting, running errands, use of private investigation services, technology services, and a Sam's Club membership. Three other members of the district office— Carl Engelke, Pat Freeland, and John Hawkins—regularly performed campaign-related activities for petitioner. Trish Kirby performed data entry for contributions to petitioner's political campaigns.

B.  *Citizens Alliance*

Citizens Alliance staff overlapped with the district office staff. Ms. Arnao, the deputy chief of staff for the district office, supervised the daily operations of Citizens Alliance in her capacity as its executive director. Roseann Anthony, another Senate staffer, served as the charity's secretary. Other Senate staff oversaw its finances.

Citizens Alliance owned property on Wharton Street near the district office. Its staff worked in a second-floor office, and some vehicles and equipment were stored in a garage area. Work orders were sent to foreman Tracy Burris, who supervised about 15 laborers.

The tasks completed by the laborers generally did not require specialty skills or craftsmanship. Most tasks involved physical labor designed to improve the appearance of petitioner's Senate district, e.g., painting walls, planting trees, picking up litter, shoveling snow, and removing graffiti. When specialized projects arose, Citizens Alliance typically hired contractors who supplied their own materials and labor.

Mr. Burris was solely responsible for securing tools and equipment for Citizens Alliance projects. These included shovels and earth-moving equipment, a power washer, chemicals needed for graffiti removal, exterior paints, and paint applicators. Mr. Burris purchased most of these items in person from retail outlets including Wilensky Locks and Hardware, Grainger, Old City Paints, and the Home Depot

**[\*16]** in South Philadelphia. By contrast, tools acquired for petitioner's personal use were almost always purchased online by Citizens Alliance or Senate office staff.

### C. *Harrisburg Senate Office*

Petitioner maintained his Harrisburg Senate office in the state capitol building. This office had three notional components: general support staff, SDAC staff, and SDCS staff.

### 1. *General Support Staff*

Paul Dlugolecki was the chief of staff for petitioner's Harrisburg office during 2001–2005. He also served the executive chair of SDAC during this period. Among his duties, Mr. Dlugolecki was responsible for overseeing payroll matters—including salaries, promotions, and leave time—for employees in petitioner's Harrisburg and Philadelphia offices. Three other staff members—Alison Pinto, Charles Sholders, and Sue Swett—provided administrative support services. Gary Tuma was the principal Harrisburg employee tasked with assisting petitioner with his political campaigns.

Petitioner required utmost loyalty from his Senate employees, both in Philadelphia and Harrisburg. One mechanism for achieving such unwavering loyalty was engineering inflated salaries for his most dependable staff members.

The Senate mandated that employees be paid according to a pay plan to ensure uniform treatment. During 2001–2005 the pay plan was updated and replaced. Both plans classified employees into jobs and placed them in salary ranges keyed to their initial classification. Classifications were based on the employee's job qualifications and the duties he or she would discharge. Senate members were required to follow the pay plan when awarding salaries. If an appropriate classification did not exist for a particular employee, members could request one from COMO, to which petitioner belonged.

Petitioner never felt obligated to follow the pay plans in effect during 2001–2005. He did not read the new pay plan, despite being a member of the committee that adopted it. He stated that he "never cared" about the pay plan, viewing it as a tool that he "didn't particularly like . . . in any way, shape or form." Instead, he was determined to give his staff members what he "thought they deserved in way of pay."

**[*17]** Senate staff generally received a salary increase on the anniversary of their hiring. Petitioner rejected this practice and set his employees' anniversary date as June 30, the end of his personal fiscal year. He gave each staff member an arbitrary cost of living adjustment that he computed, rather than adopting the Senate's proposed adjustment. He then awarded "merit raises" to his most loyal employees. He distributed a list of his proposed salaries to the chiefs of staff for the Philadelphia and Harrisburg offices, then negotiated salaries with them based on the "office politics involved."

Upon determining a final salary for each employee, petitioner delegated the processing of salaries to Mr. Dlugolecki, who was authorized to sign the required forms on petitioner's behalf. Mr. Dlugolecki endeavored to fit each employee into a pay plan classification that carried the salary petitioner wanted for that employee. If an employee did not fit under any classification, petitioner sought an exemption from COMO. Mr. Dlugolecki then submitted all paperwork to the chief clerk, who approved payroll for the Senate. Petitioner succeeded in diverting Senate funds to his staff in the form of excessive salaries because the chief clerk's office trusted the submissions it received from him.

In the income tax Notice of Deficiency the IRS calculated these amounts on the basis of summary charts used during the sentencing phase of petitioner's criminal case. After estimating the employee's actual salary for each year, the prosecutors used the Senate pay plan in effect during that year to determine the salary that employee *should have received*, given his or her qualifications and duties performed. The excess compensation diverted to each employee—i.e., the loss to the Senate—represented the difference between these amounts.

The summary charts used during the criminal case covered calendar years 1998–2003, whereas the tax years at issue here are 2001–2005. In preparing the Notice of Deficiency, the IRS calculated the excess compensation includible in petitioner's income for 2001–2005 by reference to the *average* of the overpayments shown on the summary charts for each employee. In his Amended Answers and at trial, respondent refined these computations using information on the employees' Forms W–2, Wage and Tax Statement, to calculate the total compensation they had actually received from the Senate during 2001–2005. Respondent also adjusted his calculations to reflect the fact the employment contracts ran on a fiscal year basis.

[*18] The evidence at trial established that petitioner engineered excessive salaries for 8 of his staff members, 6 of whom worked in the Philadelphia district office and 2 of whom worked in his Harrisburg office. We find that he wrongfully diverted Senate funds to them in exchange for their loyalty and personal services. The employees who received these excessive salaries were as follows:

- The Senate issued Ms. Arnao Forms W–2 for 2001–2004 showing total wages of $287,608. Her highest annual salary, which she received in 2003, was at least $88,643. Under the old pay plan in effect during 2001–2003, she was classified as "Executive Assistant IV," a position that would have required her to establish policy, meet constituents, and prepare detailed reports incorporating complex statistical material. Ms. Arnao fulfilled only one of the listed duties: meeting constituents. Her proper job classification under the Senate pay plan would have been "Field Representative," and her maximum annual salary would have been $34,449.

- The Senate issued Ms. Pauciello Forms W–2 for 2001–2005 showing total wages of $443,412. Ms. Pauciello served as a personal assistant to petitioner in the Philadelphia district office. Under the pay plan, the appropriate annual salary for an employee with that job classification would have been roughly $55,000 on average. In 2005 Ms. Pauciello instead received a salary of $106,187, which corresponded to the position of chief of staff, a position actually held by Mr. Hoffman. The pay plan required 12 years of experience and a bachelor's degree for that position. She possessed neither.

- The Senate issued Ms. Quartullo Forms W–2 for 2001–2005 showing total wages of $201,640. Ms. Quartullo, who was Ms. Pauciello's subordinate, held a secretarial position in the Philadelphia district office. Under the Senate pay plan, the appropriate annual salary for a person with that job classification would have been roughly $29,000 on average. Instead, she was classified and paid as "Research Analyst II" for 2001–2003. This job classification required the employee to hold a law degree, but Ms. Quartullo's highest level of education was high school. At trial she testified that she did not qualify for the "Research Analyst II" position and did not perform the duties that job required.

- The Senate issued Lillian Cozzo Forms W–2 for 2001–2005 showing total wages of $333,111. Her highest annual salary was

**[*19]** $70,141 in 2003. She was classified as "Executive Assistant IV" under the old pay plan and "Legislative Support, Level LS3" under the new plan. This job classification required the employee to perform "high-level public legislative research" and prepare "first drafts of sensitive legislation." Ms. Cozzo never discharged any of these duties. Her actual duties were secretarial and involved scheduling petitioner's appointments and travel arrangements, processing mail, overseeing leave balances for staff members, maintaining call logs, and answering phones. Under the Senate pay plan, her appropriate job classification would have been Administrative Level A4 and her maximum annual salary would have been $40,630.

- The Senate issued Mr. Leonetti Forms W–2 for 2001–2005 showing total wages of $169,006. Mr. Leonetti was one of petitioner's drivers in the Philadelphia district office. Senate policy prohibited members from hiring staff with the sole responsibility of driving. Apart from chauffeuring petitioner, Mr. Leonetti's duties consisted of running errands and performing clerical tasks. Under the Senate pay plan, his appropriate job classification would have been "Legislative Clerk Messenger" or "Clerk I" and his maximum annual salary would have been approximately $23,000. Instead, he was classified as "Administrative Assistant II" and received a salary as high as $36,511 in 2005.

- The Senate issued Mr. Nelson Forms W–2 for 2001–2005 showing total wages of $247,527. Mr. Nelson was petitioner's other driver in the Philadelphia district office. Apart from chauffeuring petitioner, Mr. Nelson's duties (like Mr. Leonetti's) consisted of running errands and performing clerical tasks. Under the Senate pay plan, his appropriate job classification would have been "Legislative Clerk Messenger" or "Clerk I" and his maximum annual salary would have been approximately $30,905. Instead, he was classified under the old plan as "Administrative Officer IV" and under the new plan as "Constituent Relations Level CR4," receiving a maximum salary of $54,400 in 2005.

- The Senate issued Charles Sholders Forms W–2 for 2001–2005 showing total wages of $218,515. Mr. Sholders served as petitioner's driver in Harrisburg and as resident manager of petitioner's Riverview Farm. Mr. Sholders's actual work for the Senate was clerical in nature. His proper job classification under the pay plan should have been "Legislative Clerk Messenger" or

[*20] Clerk I" and his maximum annual salary would have been roughly $25,000. Instead, he was classified as "Administrative Level A5" and later as "Constituent Relations CR4" and paid a maximum annual salary of $50,127.

- The Senate issued Ms. Swett Forms W–2 for 2001–2005 showing total wages of $379,964. Ms. Swett was petitioner's longtime secretary in the Harrisburg office, having served with him since the year he was first elected. Her proper job classification under the pay plan should have been "Administrative Level L5" and her maximum salary should have been $50,531. Instead, she was classified as "Executive Assistant IV" and later as "Policy Development I" and paid a maximum annual salary of $84,209. Ms. Swett did not discharge the duties required for those positions, which included the performance of high-level public policy research and the possession of educational qualifications she did not have.

The following table summarizes the amounts that the employees listed above received in wages during years 2001–2005 and the amounts they should have received under the Senate pay plans in effect for the relevant years:

| Employee | Office | Total Wages per Forms W–2 | Appropriate Wages per Senate Pay Plan | Amount Improperly Diverted to Employee |
|---|---|---|---|---|
| Ruth Arnao | Philadelphia | $287,608 | $116,127 | $171,481 |
| Roseanne Pauciello | Philadelphia | 443,412 | 251,003 | 192,409 |
| Maryann Quartullo | Philadelphia | 201,640 | 144,924 | 56,716 |
| Lillian Cozzo | Philadelphia | 333,111 | 201,113 | 131,998 |
| Lou Leonetti | Philadelphia | 169,006 | 99,254 | 69,752 |
| David Nelson | Philadelphia | 247,527 | 133,168 | 114,359 |
| Charles Sholders | Harrisburg | 218,515 | 104,566 | 113,949 |
| Sue Swett | Harrisburg | 379,964 | 220,915 | 159,049 |
| **Total** | | $2,280,783 | 1,271,070 | $1,009,713 |

[*21]　　　　2.　　*Senate Democratic Appropriations Committee*

SDAC's mission was twofold: calculate the economic impact of proposed legislation and work with the Senate Republican Appropriations Committee to prepare the general fund budget for the State Government. Fiscal impact statements, prepared by budget analysts, calculated the financial effects of proposed bills for Senators to use in evaluating legislation. This work occurred year round. The budget process was more seasonal, but it involved long hours as deadlines approached.

During 2001–2005, SDAC had at least six budget analysts—Gerald Sabol, Vincent Rossi, Randy Albright, Sandy Leopold, Jennifer Boger, and Christian Soura. Mr. Rossi, supported by Messrs. Albright and Soura, worked on budgets for administrative agencies, chiefly those dealing with transportation. That team responded to requests from petitioner's constituents that related to transportation issues. All other constituent services were provided by the Philadelphia district office.

　　　　3.　　*Senate Democratic Computer Services Committee*

SDCS handled procurement of computer equipment and provided IT support to the offices of all Democratic senators, including petitioner. Deborah Maguire served as executive director of SDCS during the years at issue. But petitioner did not route his computer and IT requests through Ms. Maguire. Rather, he relied on five other SDCS staffers, some of whom worked in Harrisburg and some in Philadelphia.

Leonard Luchko oversaw technology in the Philadelphia district office, where he was stationed. Petitioner viewed Mr. Luchko as his personal IT assistant and expected him to be available whenever petitioner was in Philadelphia.

Donald (Don) Wilson was employed as a computer specialist for SCDS during 2001–2005. Like Mr. Luchko, he was stationed in Philadelphia and provided IT support to petitioner's district office. Petitioner regarded Mr. Wilson as his other personal IT assistant. If Mr. Luchko was not available to assist petitioner, Mr. Wilson subbed in for him.

Mr. Wilson spent many hours providing computer assistance, not only to petitioner but also to petitioner's family, friends, girlfriends, political allies, and favored political candidates. He installed wireless networks, routers, computers, printers, stereo systems, security cameras, and other equipment at petitioner's Green Street home and his Ventnor and Margate beach properties. He made three annual 5-day trips to

[*22] Florida to perform similar tasks there, including the installation of weather forecasting equipment on petitioner's roof. He made two trips to Martha's Vineyard to shuttle luggage that did not fit on the private jet on which petitioner flew. He installed and repaired radios, DVD players, and GPS systems in petitioner's cars and in vehicles used by his family and girlfriends. He rendered computer services to petitioner's 2004 reelection campaign and to other politicians that petitioner supported.

Mark Eister joined SDCS in 1999. By 2001 he had begun devoting essentially his full time to the needs of the Harrisburg office, with particular attention to petitioner's personal needs. He routinely worked on home computer networks and laptops—for petitioner, his family members, and his girlfriends—at five different locations. He often ran personal errands for petitioner. He once traveled from the Harrisburg office to put the winter cover on the hot tub at Riverview Farm.

Dan Coyne joined SDCS in 1996 and was employed by the committee through 2005. He provided some IT support to the Harrisburg office, but he rendered most of his services to petitioner personally. He performed regular maintenance—including software and security updates, network extensions and repairs, and the addition of new functionality—to the computer and cell phone networks located in petitioner's homes, cars, vacation destinations, and Riverview Farm. He also worked on political campaigns in which petitioner had an interest.

Petitioner directed that computer equipment, cell phones, and BlackBerries—all purchased by SDCS—be distributed to his staff, family members, girlfriends, and political consultants for their personal use. Doing so violated Senate policy, which permitted computers to be issued only to Senate employees and cell phones to be issued only to senators and their chiefs of staff. Unlike any other Senate office supported by SDCS, petitioner had his own email domain, fumo.com, and he allowed non-Senate employees to communicate using that domain by providing them email addresses. He directed SDCS to set up an ex-girlfriend's email account so that all her messages were secretly forwarded to him.

Petitioner was obsessed with digital security, earning the nickname "Senator R2–D2" in the Senate. ("R2–D2" is a futuristic robot that appears in Star Wars movies.) Petitioner repeatedly directed SDCS staff to investigate security issues associated with his home computer networks and his fumo.com domain. When petitioner learned of the FBI investigation, he directed SDCS staff to "wipe" all staff cell phones and

[*23] computer equipment to prevent the disclosure of incriminating information.  *See infra* pp. 32–33.

### D.  *Senate Contractors*

By virtue of his official positions, petitioner was able to direct the hiring of independent contractors who were paid by the Senate.  Many of these contractors did little or no actual legislative work.  To the extent they performed services at all, those services were rendered chiefly to petitioner personally, to his political campaigns, and to the campaigns of other politicians he supported.

### 1.  *Private Investigator*

Frank Wallace was employed by the Senate as a contractor during 1999–2005.  The stated purpose of his contract was to serve as "Private Investigator for the services of providing information analysis and consultion [sic] to the staff of the [Democratic] Senate Appropriations Committee."  Beginning in 2001 or earlier, however, Mr. Wallace's sole mission was to render private investigation and related services to petitioner.

Some assignments that petitioner directed to Mr. Wallace involved investigating people in his personal life, e.g., his ex-wives, his ex-girlfriends, and his butler.  Other assignments involved efforts to gather dirt on petitioner's political foes or personal enemies.  Mr. Wallace was directed to investigate public officials who had criticized petitioner and complaints made to police about a dumpster on petitioner's property.  Mr. Wallace surveilled rallies held by petitioner's political enemies and monitored polling locations on election day.  He swept petitioner's home and offices for listening devices or "bugs."  And he often provided physical security for political candidates whom petitioner supported.  Many of Mr. Wallace's investigations were time intensive and required help from an assistant, whom Mr. Wallace typically paid out of the Senate contract.  When the Senate contract was not sufficient to cover the assistant's costs, Citizens Alliance paid for the services.

### 2.  *Political Campaign Consultants*

Petitioner secured the retention of two political consultants who were paid by the Senate.  The first was Howard Cain, who worked as an independent contractor during 2001–2005.  Mr. Cain came on board after a brief stint as a Senate employee and volunteer for Fumo for Senate.

**[\*24]** He contracted through his business, Venture Analysis, Inc. (Venture Analysis).

Under the contract, Mr. Cain was supposed to provide consulting services on local community and governance issues. But he devoted virtually 100% of his time during 2001–2005 to political campaign work for petitioner and his political allies. Ms. Quartullo testified before the grand jury that Mr. Cain was a political adviser and that she knew of no legislative work he had performed. Ms. Spagna knew Mr. Cain and described him as a "political consultant." Mr. Cain testified that his contract omitted the actual purpose of his work because petitioner "couldn't have the state pay for political campaigns."

Mr. Cain also assisted petitioner with personal matters. In September 2001 the position of Pennsylvania lieutenant governor became vacant. The vacancy was filled by Senator Jubelirer, a Republican whom petitioner disliked. Petitioner directed Mr. Cain and Christopher Craig (a Senate attorney) to arrange a lawsuit against Senator Jubelirer, funded by an "anonymous donor." Legal fees in the case totaled around $17,000, and the "anonymous donor" turned out to be Citizens Alliance. In October 2001 it issued a $20,000 check to Mr. Cain's business, Venture Analysis, which paid $17,000 to the lawyer and kept the difference.

Philip Press served as Senate contractor during 2002–2005. Petitioner met him while he was working on the Casey for Governor campaign. After brief service on petitioner's district office staff, he was given a series of Senate contracts at petitioner's direction.

Mr. Press's contracts said that he would provide consulting services regarding "e-commerce issues" and "local community and governance issues." In fact his services consisted almost entirely of political campaign work, for both petitioner and his political allies. Mr. Cain described him as a "foot soldier," i.e., someone who accompanied petitioner to political events and performed miscellaneous tasks for him.

Mr. Press represented in a 2003 email to Mr. Dlugolecki, the Harrisburg chief of staff, that he had done no legislative work. Ms. Quatrullo and Ms. Spagna knew that Mr. Press was involved in "political campaigns" and could identify no legislative work he had performed. Like Mr. Cain, he assisted petitioner by promoting candidates whom petitioner favored and opposing candidates whom petitioner disliked. In

**[\*25]** so doing Mr. Press minted "political capital" for petitioner, an asset petitioner valued greatly.

### 3.   *"Ghost Contractors"*

Petitioner retained two other contractors who were paid by the Senate.  We refer to these individuals as "ghost contractors" because they performed no services of any kind for the Senate.  Petitioner provided them contracts as a reward for their personal services to him, their loyalty, and their close friendship.

Michael Palermo served as petitioner's first chief of staff and later as Deputy Director of the Pennsylvania Turnpike Commission.  In 2000 petitioner hired him as a consultant to provide SDAC with "fiscal and operational analysis of intrastate transportation issues."  He was paid almost $230,000 for alleged consulting services during 2000–2004.

Mr. Palermo in fact performed no services whatsoever for the Senate.  During legislative sessions he regularly hosted petitioner at his Hummelstown, Pennsylvania, residence.  When petitioner expressed interest in owning a farm, Mr. Palermo took the bit between his teeth.  He attended the auction to purchase Riverview Farm, oversaw eviction of the existing tenant, supervised renovation and repairs, planned crop rotations, managed invoices, and arranged for the purchase of needed equipment.

Mr. Palermo's monthly invoices supplied no detail regarding the nature of his work.  They stated simply that he had devoted a specific number of hours to "services rendered."  He eventually pleaded guilty to a Federal conspiracy charge arising from his receipt of this no-work contract.

Mr. Rubin was a close friend of petitioner and the eventual husband of Ms. Arnao.  With Fred Blum he owned and operated B&R Professional Services (B&R), which provided court reporting and process service for law firms in the Philadelphia area.  Through his work he was well connected with individuals campaigning for political office, particularly judicial candidates and other politicians petitioner supported.  Beginning in October 1999 petitioner caused SDAC to contract with B&R to provide "research . . . on legislative matters . . . [and] constituent service."  To the extent Mr. Rubin provided any services at all, they were not rendered to SDAC but to petitioner and his political allies.

[*26] Mr. Rubin received a contract from the Senate under which he was paid $30,000 annually for four years. Like Mr. Palermo, he submitted monthly invoices to SDAC that stated simply "services rendered" and the dollar amount of the invoice. No member of the SDAC staff, petitioner's Harrisburg staff, or petitioner's Philadelphia district office could identify any work Mr. Rubin or B&R had performed for the Senate. In 2010 Mr. Rubin pleaded guilty to an obstruction of justice charge arising from his receipt of this no-work contract.

### E. *Fumo for Senate*

Fumo for Senate, petitioner's political campaign entity, was housed on the second floor of 1208 Tasker Street, directly above his district office. There was no meaningful division of labor between these two entities. Petitioner expected his Senate staff to assist as needed in his Senate campaigns and related political events. They regularly did so.

Petitioner formed and/or controlled several political action committees (PACs) that supported him and other candidates he favored. These PACs included the Committee for Democratic Majority, Public Service PAC, Bipartisan PAC, PA Leader (a Federal PAC), and PA 2100. Petitioner's Senate employees were tasked with managing the finances of these PACs and processing contributions to bank accounts in their names. Senate employees were sometimes required (or strongly encouraged) to make contributions to the PACs themselves.

Fumo for Senate sponsored two annual fundraisers, which were planned and arranged from top to bottom by staff members in the Philadelphia district office. The first event, the Harry Truman Dinner, occurred on or near May 8, which was petitioner's birthday and also the birth date of the former president. The second fundraiser, in October, was held at petitioner's home. Petitioner's Philadelphia staff devoted hundreds of hours to these fundraisers annually.

Petitioner ran for reelection in 2004, and the duties of his Senate staff then shifted even further in a political direction. Campaign-related tasks took precedence over all other matters. Tasks included (among other things) late nights canvassing prospective voters, participation in lengthy conference calls, copious note taking during campaign meetings, and transcription of those notes into minutes for distribution to campaign team members.

[*27] F.    *Other Personal Services*

Lisa Costello, a staff member in petitioner's Philadelphia satellite office, initially provided housecleaning services for petitioner at his Green Street home.  Nicole Barrett, who cleaned the Philadelphia district office once a week, subsequently took over for Ms. Costello.  Ms. Barrett cleaned the Green Street home two days a week and was paid in cash by petitioner's district office staff.  When Ms. Barrett needed cleaning supplies, she purchased them, and the staff reimbursed her in cash.

Matthew Fonseca was hired as a butler for the Green Street home after meeting petitioner on a yachting trip in Martha's Vineyard.  He lived in the home and traveled to petitioner's other homes as needed.  Mr. Fonseca was paid by check monthly by petitioner's district office staff.

Charles Sholders, a full-time Senate employee in the Harrisburg office, worked on petitioner's farm.  He spent 80% of his time working at the farm during the 6 months of the year when the Senate was not in session.  He received no compensation, apart from his Senate salary, for this work.  Mr. Sholders lived on the farm with his wife and family from September 2003 through January 2005.  In exchange for these accommodations, his wife, Margaret Sholders, assumed responsibility for looking after the horses and goats on the farm.

Lewis Jack, who was not a member of petitioner's staff, also lived and worked on Riverview Farm.  He performed construction projects that included renovation of the farmhouse and guesthouse, excavation work, building barns, and doing utility work.  At the direction of Mr. Palermo and petitioner, Mr. Jack directed to Citizens Alliance all invoices relating to his work.  When Mr. Jack told petitioner that he needed a bulldozer on the farm, petitioner authorized Citizens Alliance to pay for it.  Mr. Jack acquired a used Caterpillar bulldozer for $13,900 in July 2003 and sold it to Citizens Alliance for $27,000.  In December 2003 Citizens Alliance paid $16,000 to repair the bulldozer.  The bulldozer never left the farm.

V.    *Activities of Citizens Alliance*

In its early years Citizens Alliance funded its community betterment projects with grants from the State of Pennsylvania, which petitioner helped secure.  Originally its initiatives were modest endeavors.  But the trajectory of its mission changed in 1998 when it received a $17

[*28] million grant from Pennsylvania Electric Co. (PECO). The utility made that grant after petitioner agreed to drop a lawsuit against it. He endeavored to conceal PECO's donation from the public, fearing criticism from the press. It was ultimately uncovered after an investigation by the Philadelphia Inquirer.

With this influx of cash, Citizens Alliance vastly expanded the scope and scale of its activities. It opened two charter schools and undertook revitalization of a business district in south Philadelphia. But a good portion of the cash was used to benefit petitioner and his political allies. Petitioner contends that the benefits he received "were minuscule in comparison" to the donations he obtained for Citizens Alliance. But the criminal trial established that he received significant personal benefits from Citizens Alliance, ultimately resulting in an order that he pay $1,165,317 in restitution to the charity.

A.    *Travel to Cuba*

Petitioner arranged three trips to Cuba through Alliance for a Responsible Cuba Policy (ARCP), a charitable organization that advocated termination of the U.S. embargo of Cuba. To facilitate these trips, petitioner directed Citizens Alliance to make (and during 2001–2003 it made) payments of $39,000 to ARCP. These payments enabled petitioner and his friends to travel to Cuba largely free of charge.

The first trip arose when former U.S. Senator Arlen Spector invited petitioner to travel to Cuba with ARCP. To pay for this trip, Citizens Alliance transferred $12,000 to ARCP in October 2001. Petitioner asked Mr. Rubin to accompany him, and they visited Cuba for 3 days in November 2001. They incurred no expense for this trip apart from air travel to and from Tampa, Florida.

The second trip occurred two months later. To pay for this trip, Citizens Alliance transferred $10,000 to ARCP in January 2002. Petitioner did not intend to join this trip, but he wanted Robert Gross, a close friend, to join. Mr. Gross selected Ed Jacobs, a New Jersey attorney and later Ms. Arnao's criminal defense lawyer, to accompany him. They visited Cuba on an ARCP-sponsored trip for 3 days in February 2002. Neither of them incurred any expense for this trip apart from air travel to and from Tampa.

The third trip occurred six months later. To pay for this trip, Citizens Alliance (through CA Holdings) transferred $7,000 to ARCP in September 2002. At petitioner's invitation, two of his close friends,

**[\*29]** Carmen DiCamillo and Gerald Catania, joined this trip. They traveled to Cuba with ARCP from September 27 to 29, 2002. They incurred no expense for this trip apart from air travel and hotel costs in Cuba. Although petitioner arranged no further trips to Cuba, Citizens Alliance made additional payments to ARCP after the third trip, transferring $5,000 in November 2002 and another $5,000 in September 2003. The evidence at trial did not conclusively establish the purpose of these two payments.

Apart from petitioner, the travelers on these trips had no knowledge that Citizens Alliance was paying their way. The trip itineraries included cultural experiences and a few meetings with government officials but no activities having any obvious connection to Citizens Alliance's mission. Petitioner contended that the trips could strengthen trading relationships for Philadelphia's shipping industry, despite the U.S. embargo against trade with Cuba.

B.     *Political Polling*

Citizens Alliance paid $254,560 for political polling during 2002 and 2003, despite the bar against charities' engaging in political campaign activities. *See* § 501(c)(3). These polls were conducted by Kiley & Co. (Kiley) and Global Strategy Group, Inc. (GS Group). The polls generally tested voter attitudes toward candidates petitioner had endorsed or was considering endorsing.

One set of polls, directed mainly to Philadelphia residents, asked whether respondents were likely to vote for certain people for mayor of Philadelphia, the city council, and other positions. A second set of polls canvassed voter preferences about Kathleen Fitzpatrick, who was seeking a seat on the Philadelphia city council. A third set tested voter attitudes toward public officials in Bucks County (an eastern Philadelphia suburb) and a Senate special election there. Polling expenses, with most payments routed through CA Holdings, were as follows:

| Year | Polling Company | Amount |
|------|-----------------|--------|
| 2002 | Kiley | $28,000 |
| 2002 | Kiley | 16,800 |
| 2002 | GS Group | 16,950 |
| 2002 | GS Group | 34,250 |
| 2002 | GS Group | 10,000 |
| 2002 | GS Group | 5,500 |

**[\*30]**

| | | |
|---|---|---|
| 2002 | GS Group | 15,500 |
| 2003 | GS Group | 39,899 |
| 2003 | GS Group | 33,536 |
| 2003 | GS Group | 54,125 |
| **Total** | | **$254,560** |

Petitioner received a summary of the results of each poll. He did not share the results with the candidates who were the subjects of the polls. Rather, he kept the results to himself and his political consultants to help them decide whom to support (or refrain from supporting) in state and local political races.

Political polls provide a wealth of information about candidates, and petitioner endorsed candidates as a means of amassing political power. He caused Citizens Alliance to pay for this polling to enhance his political stature, which could be tarnished if he backed the wrong horse. He liked to say that he could "play in many sandboxes," by which he meant that he could mingle in different political circles. Citizens Alliance's payment of polling expenses provided a "tool" that helped him do this.

When Citizens Alliance's accountants inquired about these polling expenses, Ms. Arnao at petitioner's instruction replied that the polls had been conducted to survey community attitudes and consisted of "neighborhood questions." As a public charity, Citizens Alliance was required to file annually Form 990, Return of Organization Exempt From Income Tax. Neither on its 2002 nor on its 2003 return did Citizens Alliance disclose the true nature or amount of its expenditures for polling. As a for-profit entity, CA Holdings was required to file annually Form 1120, U.S. Corporation Income Tax Return. On its 2002 return it deducted $151,425 for "community development consulting" expenditures, which were actually disguised political polling expenses.

Fumo for Senate ultimately reimbursed Citizens Alliance for $215,161 of the polling expenses discussed above. One of petitioner's PACs reimbursed CA Holdings $41,000 to cover the balance of the expenses. These reimbursements were made on the theory that Citizens Alliance had paid for the polling in error.

C.    *Ventnor Dunes Project*

In 2001 the U.S. Army Corps of Engineers, in conjunction with the New Jersey Department of Environmental Protection, embarked on

**[*31]** a plan to protect the Ventnor shoreline with dune construction (Ventnor Dunes Project). Petitioner was alerted to this project by his girlfriend, Ms. Egrie, who resided in the area. Petitioner opposed this project, believing that the enlarged dunes might obstruct the ocean view from his Margate home and lower its property value.

At petitioner's direction, Mr. Craig, an attorney employed by the Senate, helped organize entities to oppose the Ventnor Dunes Project. Citizens Alliance funded the incorporation of these entities and contributed $30,000 to one of them. The entities thus formed included the Riparian Defense Fund (RDF), which represented that its mission was to educate property owners about their riparian rights. RDF's true mission was to oppose dune construction in New Jersey shore towns. Another entity was the Downbeach Community Development Corp. (DCDC); it had nothing to do with community development but simply opposed dune construction that petitioner disfavored. Petitioner appointed Ms. Egrie as president and trustee of DCDC. He saw this appointment as an opportunity for his girlfriend to enter local politics with the ultimate goal of running for mayor of Ventnor.

In the hope of raising money more effectively, these and other anti-dune organizations wanted to solicit tax-deductible contributions. At petitioner's direction, Citizens Alliance paid $28,926 to Pepper Hamilton, a Philadelphia law firm, to file IRS applications for section 501(c)(3) status. When the IRS requested more information about one of the entity's proposed activities, petitioner decided to abandon that effort. None of the entities was ever recognized by the IRS as a charity.

Petitioner enlisted his Senate staff and consultants, including Ms. Arnao and Mr. Cain, to assist the anti-dune organizations. Mr. Cain did research about which towns planned dune-related referenda and strategized about how to affect their outcomes. Mr. Cain and other consultants handled questions from the press, printed and mailed 18,000 postcard flyers, ran newspaper ads, and created robocalls to residents. Citizens Alliance paid $9,720 for the consultants' efforts. It reported no expenditures as having been made "attempting[] to influence legislation," *see* § 501(c)(3), even though it had paid a total of $21,690 in efforts to influence referenda in 2002.

All in all, Citizens Alliance paid $68,645 to oppose the Ventnor Dunes Project. Although petitioner carefully concealed his involvement at the time, he later insisted that Citizens Alliance's activities benefited his constituents, on the theory that some of them owned property on the

[*32] New Jersey shore. And he sought to rationalize Citizens Alliance's $30,000 cash contribution as "one section 501(c)(3) entity giving to another," although none of the anti-dune entities was ever granted tax-exempt status.

VI.  *FBI Investigation*

In late 2003 petitioner became concerned that he might be the subject of an FBI investigation. His fears were triggered when he learned that a subpoena had been issued to Ms. Arnao. His fears were amplified when articles appeared in the Philadelphia Inquirer suggesting that he was under investigation for his relationship to Citizens Alliance.

Petitioner took several steps in response. First, he deployed Senate funds to find out whether any listening devices or "bugs" had been planted in his residences or offices. Frank Wallace, the private investigator to whom petitioner issued a Senate contract, performed these "sweeps." As petitioner's concern grew, he directed routine sweeps, not only of his Green Street home, but also of Citizens Alliance's headquarters and Ms. Arnao's home.

Second, petitioner implemented a new policy regarding his staff's use of technology. He directed SDCS employees to program computers with automatic encryption—commonly called "pretty good privacy" (PGP)—and perform routine PGP or "Secure Clean" hard drive deletion on all staff computers and cell phones. Manual file deletion merely removes access to a file. By contrast, PGP and Secure Clean programs permanently remove or "wipe" files from the hard drive. These wiping programs took hours to perform on each computer and made computer performance sluggish.

At petitioner's direction, SDCS staff implemented these wiping programs on all staff equipment in the Philadelphia and Harrisburg offices. Messrs. Luchko and Wilson, the SDCS staffers stationed in Philadelphia, played the leading roles in these "wiping" programs. Petitioner indicated to Mr. Wilson that his objective was to prevent the Federal government from accessing Senate emails. SDCS staff routinely monitored equipment manually to ensure that emails and sensitive data had disappeared.

Mr. Luchko initiated an "email audit" policy at petitioner's direction in 2004. This policy mandated that all Senate staff manually delete, within a week of receipt, all emails they received from petitioner. Mr.

[*33] Luchko enforced this policy by personally reading staff emails. This practice ran in conjunction with regular PGP and Secure Clean wipes.

For his personal computer equipment petitioner sought a higher level of protection. To that end he directed Messrs. Luchko and Eister to implement what are sometimes called Department of Defense or "DoD" wipes on all IT equipment maintained at his residences. DoD wipes are more comprehensive than PGP wipes because they overwrite content six times rather than three. Mr. Eister at trial described them as the "mother of all wipes," stating that they could take a full day to perform.

During January 2005 the U.S. Attorney's Office engaged in discussions with petitioner about the maintenance of digital evidence. But he did not desist from wiping computers after these conversations. Quite the contrary: He persuaded SDCS to purchase European virus scanning software that alerts users if a government authority has remotely installed "Magic Lantern," a keystroke-monitoring software that reports activity back to the government.

Pursuant to a subpoena the FBI in February 2005 searched Citizens Alliance's headquarters. The results of that search alerted Federal authorities to the data erasure, prompting searches of petitioner's Harrisburg and Philadelphia offices on February 18 and 19, 2005. Because of the extensive wiping activity ordered by petitioner, the FBI recovered very few email messages from the computer equipment used by petitioner and his staff. At petitioner's direction SDCS supplied his office with a new email server, and SDCS staff continued to enforce the security measures dictated by petitioner until April 20, 2005. Still, some PGP wipes continued to occur as late as September 2005.

VII.  *Criminal Trial*

In February 2007 a grand jury in the Eastern District of Pennsylvania indicted petitioner on 139 counts of criminal activity. Sixty-four counts charged him with intent to defraud the Senate; 34 counts, on which Ms. Arnao was a codefendant, charged him with a scheme to defraud Citizens Alliance; 32 counts charged him with obstruction of justice or conspiracy to commit obstruction of justice; and 4 counts related to facilitating tax evasion by Citizens Alliance.

In March 2009, following a 6-month trial, petitioner was convicted on 137 counts, including the 4 Federal tax counts. After several appeals

[*34] related to sentencing, he was ultimately required to pay restitution of $2,517,274 to the Senate and restitution of $1,165,317 to Citizens Alliance. These were the losses petitioner caused to those organizations, as determined by the district court in the criminal case.[2]

VIII. *IRS Civil Examination*

Following the termination of all criminal appeals, the IRS commenced examinations concerning petitioner's civil tax liabilities for 2001–2005. The examination was conducted by two teams, one focusing on income tax and the other on excise tax. The income tax case was assigned to Revenue Agent (RA) Kenneth Kelly and RA Ken Rotan. At that time Lloyd Doletski was RA Kelly's group manager and thus his immediate supervisor.

Chris Ricco, an attorney with the Office of Chief Counsel, was assigned to provide legal assistance to RA Kelly during the income tax examination. After reviewing the case file, Mr. Ricco recommended that the 75% fraud penalty be asserted for each year. *See* § 6663(a). Mr. Ricco's recommendation to this effect was set forth in Workpaper 100-1, Examining Officer's Activity Record. In that document RA Kelly indicates that Mr. Ricco had recommended civil fraud penalties against petitioner as of August 7, 2012.

RA Kelly accepted Mr. Ricco's recommendation and included the fraud penalties in a draft Form 4549, Income Tax Examination Changes. Mr. Doletski, RA Kelly's immediate supervisor, reviewed the case file and signed a 30-day letter that included the Form 4549. On October 3, 2012, the IRS mailed the 30-day letter to petitioner. That document constituted the first formal communication to petitioner that the IRS intended to assert fraud penalties against him.

On May 10, 2013, the IRS issued petitioner a Notice of Deficiency for section 4958 excise tax for calendar years 2002–2004. It based these deficiencies on its determinations that petitioner was a "disqualified person" of Citizens Alliance and had engaged in "excess benefit transaction[s]" with it. *See* § 4958(a)(1). The excess benefits allegedly included

---

[2] The monetary loss to Citizens Alliance was determined by the trial court to be $1,566,528, and petitioner was ultimately ordered to pay 75% of that loss (Ms. Arnao having been held partially responsible). However, the Third Circuit on the second appeal noted that petitioner "reaped approximately 96% of the gains or benefits arising out of the [Citizens Alliance] fraud." *United States v. Fumo*, 513 F. App'x 215, 220 (3d Cir. 2013).

**[\*35]** (among other things) consumer goods, use of vehicles and farm equipment, personal services rendered by employees, trips to Cuba, political polling, and the Ventnor Dunes Project.

The Notice determined first-tier excise taxes under section 4958(a)(1), equal to 25% of the excess benefits, and additions to tax under section 6651(a)(1) for failure to timely file.[3] The additions to tax were imposed because petitioner had neglected to file Form 4720, Return of Certain Excise Taxes on Charities and Other Persons Under Chapters 41 and 42 of the Internal Revenue Code, for the three tax years at issue. The excise tax deficiencies and additions to tax determined in this Notice were as follows:

| Year | Deficiency | § 6651(a)(1) Addition to Tax |
|------|-----------|-------------------------------|
| 2002 | $71,330 | $17,833 |
| 2003 | 96,006 | 24,001 |
| 2004 | 24,116 | 6,029 |

On May 14, 2013, the IRS issued petitioner a Notice of Deficiency for income tax for 2001–2005, plus a fraud penalty for each year. The deficiencies were determined on the basis of the taxable benefits petitioner had allegedly extracted from the Senate and Citizens Alliance, plus adjustments to itemized deductions no longer at issue. The amounts determined in this Notice were as follows:

| Year | Deficiency | § 6663(a) Penalty |
|------|-----------|-------------------|
| 2001 | $217,225 | $162,919 |
| 2002 | 208,295 | 156,221 |
| 2003 | 164,706 | 123,529 |
| 2004 | 88,006 | 66,005 |
| 2005 | 67,905 | 50,929 |

---

[3] The Notice also determined second-tier excise taxes under section 4958(b), which are imposed at a 200% rate if excess benefit transactions are not timely corrected. Petitioner paid restitution of $1,165,317 to Citizens Alliance before the Notices of Deficiency in these cases were issued. The IRS considered this payment to constitute "correction" of the excess benefit transactions within the meaning of section 4958(f)(6). Respondent has thus conceded the second-tier deficiencies determined under section 4958(b).

**[\*36]** IX.    *Tax Court Proceedings*

Extensive motions practice occurred in both docketed cases.  By Order served March 21, 2019, we consolidated the two cases for trial, briefing, and opinion.  Several questions were decided by Order, and we issued an Opinion in the excise tax case in May 2021. *Fumo v. Commissioner*, T.C. Memo. 2021-61, 121 T.C.M. (CCH) 1475.  We address these matters briefly below.

On October 10, 2019, respondent filed a Motion for Leave to File Amended Answer in the income tax case, seeking to quantify more precisely the taxable benefits petitioner allegedly extracted from the Senate.  First, respondent sought to calculate the alleged benefits from Senate consultants and contractors by reference to the actual start and end dates of their contracts.  Second, in situations where petitioner's alleged taxable benefits were determined by reference to an employee's wages, respondent sought to compute those wages using information on the employee's Forms W–2, instead of the rough estimates used for sentencing purposes during the criminal trial.  Third, respondent sought to reallocate small amounts of alleged benefits from one year to another, as determined by the year of actual payment.

We granted respondent's Motion for Leave on December 3, 2019. As asserted in respondent's First Amended Answer, the income tax deficiencies and fraud penalties determined for 2001–2005 were as follows:

| Year | Deficiency | § 6663(a) Penalty |
|------|------------|-------------------|
| 2001 | $230,966 | $173,225 |
| 2002 | 225,745 | 169,309 |
| 2003 | 195,627 | 146,730 |
| 2004 | 84,829 | 63,622 |
| 2005 | 76,627 | 57,470 |

On October 10, 2019, respondent filed a Motion for Partial Summary Judgment contending that (1) petitioner is collaterally estopped from relitigating facts established in his criminal case, including the fact that his fraudulent actions caused misappropriations from his victims; and (2) his "misappropriations constitute taxable benefits received by petitioner . . . as a matter of law." On February 3, 2020, petitioner filed a Motion for Partial Summary Judgment contending that respondent is collaterally estopped, by the district court's decision not to enter a

**[\*37]** judgment of forfeiture, from asserting that petitioner received gross income.

By Order served February 28, 2020, we denied both Motions. Regarding respondent's Motion, we acknowledged that collateral estoppel would prevent petitioner from relitigating many facts established during his criminal trial. But we declined to decide on summary judgment what those facts might be, and we held that collateral estoppel in any event would not prevent petitioner from contesting the dollar amounts of unreported income respondent determined. Regarding petitioner's Motion, we held that respondent is not collaterally estopped from asserting that petitioner received gross income because there is no identity between "proceeds" for purposes of 18 U.S.C. § 981 and "income" for purposes of section 61. Thus, the district court's decision not to enter a judgment of forfeiture should not be given collateral estoppel effect. [4]

On May 22, 2020, the parties filed a Stipulation of Settled Issues in the excise tax case, memorializing several concessions by respondent. Respondent concurrently filed a Motion for Leave to File First Amendment to Answer; petitioner did not object to that Motion, and we granted it on June 1, 2020. The combined effect of these two filings was to reduce the excess benefits that respondent alleged in the excise tax case by $60,396 for 2002, by $96,760 for 2003, and by $76,411 for 2004.

On February 3, 2021, respondent filed a Motion for Partial Summary Judgment in the excise tax case, seeking rulings that petitioner was a "disqualified person" of Citizens Alliance within the meaning of section 4958(a) and had received "excess benefits" from it during 2002–

_____

[4] Petitioner in his Posttrial Brief persists in contending that collateral estoppel applies to prevent respondent from asserting that he received gross income. Further, he asserts that the law-of-the-case doctrine has the same effect because the United States declined to appeal the district court's decision not to enter a judgment of forfeiture. Again we disagree. "The law-of-the-case doctrine generally provides that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Musacchio v. United States*, 577 U.S. 237, 244–45 (2016) (internal quotations omitted) (quoting *Pepper v. United States*, 562 U.S. 476, 506 (2011)). The premise of the doctrine is that "the same issue presented a second time in the same case in the same court should lead to the same result." *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (emphasis omitted). Here, the forfeiture question was presented in a separate case in a different court. And as we held in our Order served February 28, 2020, the receipt of "proceeds" in a forfeiture context is not equivalent to receipt of gross income under section 61. *Cf. McHan v. Commissioner*, 558 F.3d 326, 332 (4th Cir. 2009) (finding that the outcome of a criminal forfeiture proceeding was not preclusive with respect to gross income), *aff'g* T.C. Memo. 2006-84.

[*38] 2004.  By Opinion served May 17, 2021, we granted respondent's Motion on the first point but denied it on the second, deferring to trial any determination as to the amount of excess benefits petitioner received in his capacity as a "disqualified person."  *Fumo*, 121 T.C.M. (CCH) at 1478.

After conclusion of the trial respondent filed in each case a Motion to Conform the Pleadings to the Proof and lodged with each a Second Amendment to Answer.  On the basis of the evidence submitted at trial, respondent sought to amend his Answer in the excise tax case to include, as an excess benefit petitioner received, the value of a Jeep Wrangler owned and maintained by Citizens Alliance but allegedly used exclusively by petitioner.  Petitioner did not object to that Motion.

On the basis of the evidence submitted at trial, respondent sought to amend his Answer in the income tax case to (1) allege a slight increase in the unreported income petitioner derived from services performed for his benefit by Senate employees and contractors, (2) include in petitioner's gross income the fair rental value of three pieces of Citizens Alliance equipment used at his farm, and (3) include in petitioner's gross income political polling and other expenses allegedly paid by Citizens Alliance at his direction.  After receiving a response from petitioner, we granted both Motions by Order served on May 19, 2023.

In the light of these Amendments to Answer and taking into account respondent's concessions in the Stipulation of Settled Issues, the amounts currently in dispute appear to be as follows:

| Year | Income Tax Deficiency | § 6663(a) Penalty | Excise Tax Deficiency | § 6651(a)(1) Addition to Tax |
|------|------|------|------|------|
| 2001 | $284,402 | $213,302 | – | – |
| 2002 | 337,647 | 253,235 | $63,649 | $15,912 |
| 2003 | 309,947 | 232,460 | 72,262 | 18,066 |
| 2004 | 168,803 | 126,602 | 6,209 | 1,552 |
| 2005 | 190,667 | 131,902 | – | – |

OPINION

I.   *Burden of Proof*

The IRS's determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving them

[*39] erroneous. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Section 7491 provides that the burden of proof on a factual issue may shift to the Commissioner if the taxpayer satisfies specified conditions. Among these conditions are that the taxpayer must have "introduce[d] credible evidence with respect to [that] factual issue," § 7491(a)(1), and must have "complied with the requirements under this title to substantiate any item," § 7491(a)(2)(A). Petitioner has not satisfied these requirements with respect to any factual issue that has salience in deciding the questions presented. For the most part, the burden of proof thus remains on him.

The burden of proof is on respondent "in respect of any new matter [and] increases in deficiency." *See* Rule 142(a)(1). Respondent thus bears the burden of proof with respect to the increased deficiencies alleged in his Amended Answers. Respondent likewise bears the burden on the issue of fraud "and that burden of proof is to be carried by clear and convincing evidence." *See* Rule 142(b).

II. *Period of Limitations*

Section 6501(a) generally requires the IRS to assess a tax within three years after the return was filed. The period of limitations is extended to six years where the taxpayer omits from gross income an amount "in excess of 25 percent of the amount of gross income stated in the return." § 6501(e)(1)(A). The Notice of Deficiency in the income tax case was issued on May 14, 2013, more than six years after the period of limitations began to run for 2005, the last of petitioner's tax years at issue.

Section 6501(c)(1) provides that, where a taxpayer has filed "a false or fraudulent return with the intent to evade tax," there is no period of limitations, and the tax "may be assessed . . . at any time." "[T]he determination of fraud for purposes of the period of limitations on assessment under section 6501(c)(1) is the same as the determination of fraud for purposes of the penalty under section 6663 . . . ." *Neely v. Commissioner*, 116 T.C. 79, 85 (2001). As explained more fully in our discussion of the fraud penalty, we find that petitioner's income tax returns for 2001–2005 were fraudulent. *See infra* pp. 81–88. His income tax liability for all four years may thus be assessed "at any time." § 6501(c)(1).

The Notice of Deficiency in the excise tax case was issued on May 10, 2013, more than three years after the applicable period of limitations

**[\*40]** had begun to run. As explained more fully in our discussion of the excise tax issue, we find that petitioner's excise tax liability for 2002–2004 may likewise be assessed "at any time." *See infra* pp. 76–77.

III.    *Unreported Income*

In cases of unreported income, the Commissioner must establish an evidentiary foundation connecting the taxpayer with the income-producing activity or demonstrate that the taxpayer actually received income. *Anastasato v. Commissioner*, 794 F.2d 884, 886–87 (3d Cir. 1986), *vacating and remanding* T.C. Memo. 1985-101; *Walquist v. Commissioner*, 152 T.C. 61, 67 (2019). "Once the Commissioner makes the required threshold showing, the burden shifts to the taxpayer to prove by a preponderance of the evidence that the Commissioner's determinations are arbitrary or erroneous." *Walquist*, 152 T.C. at 67–68 (citing *Helvering v. Taylor*, 293 U.S. 507, 515 (1935)); *see Texasgulf, Inc., & Subs. v. Commissioner*, 172 F.3d 209, 214 (2d Cir. 1999), *aff'g* 107 T.C. 51 (1996).

A taxpayer must maintain books and records establishing the amount of his gross income. *See* § 6001. When a taxpayer does not keep accurate books and records, the IRS may reconstruct his income "under such method as, in the opinion of the Secretary, does clearly reflect income." § 446(b); *see Petzoldt v. Commissioner*, 92 T.C. 661, 693 (1989). Such reconstruction "need only be reasonable in light of all surrounding facts and circumstances." *Petzoldt*, 92 T.C. at 687.

The IRS reconstructed petitioner's income using various types of records, most of which had been collected by the FBI and presented to the district court during the criminal case. These included bank records, Citizens Alliance records, Senate records, law firm invoices, third-party vendor information, employment contracts, and employee Forms W–2. Because petitioner orchestrated a large-scale destruction of digital evidence during 2003–2005, very few emails and electronic documents were recovered from Citizens Alliance or from petitioner's Senate offices. *See supra* pp. 32–33. Given his obstructive conduct, we can hardly say that he kept accurate records.

A taxpayer's gross income generally includes "all income from whatever source derived." § 61(a); *see Charley v. Commissioner*, 91 F.3d 72, 73–74 (9th Cir. 1996), *aff'g in part, rev'g in part* T.C. Memo. 1993-558. "The starting point in all cases dealing with the question of the scope of what is included in 'gross income' begins with the basic premise

**[\*41]** that the purpose of Congress was 'to use the full measure of its taxing power.'" *James v. United States*, 366 U.S. 213, 218–19 (1961) (quoting *Helvering v. Clifford*, 309 U.S. 331, 334 (1940)). Section 61 accordingly includes in gross income "all gains except those specifically exempted." *James*, 366 U.S. at 219.

"A gain 'constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it.'" *Ibid.* (quoting *Rutkin v. United States*, 343 U.S. 130, 137 (1952)). This is true regardless of whether the recipient obtains title to property giving rise to the gain. *Id.* at 216–17. For gains that take a form other than cash, a taxpayer's gross income generally includes the difference between the fair market value of goods and services he receives and the amount (if any) he paid for those items. *See* Treas. Reg. § 1.61-2(d)(2).

Gross income under section 61(a) also includes items of income that the taxpayer has constructively received. *Estate of Geiger v. Commissioner*, 352 F.2d 221, 231 (8th Cir. 1965), *aff'g* T.C. Memo. 1964-153. "Under the constructive receipt doctrine 'funds [or other property] which are subject to a taxpayer's unfettered command and which he is free to enjoy at his option are constructively received by him whether he sees fit to enjoy them or not.'" *Estate of Caan v. Commissioner*, 161 T.C. 77, 95 (2023) (alteration in original) (quoting *Estate of Brooks v. Commissioner*, 50 T.C. 585, 592 (1968)); *accord Benes v. Commissioner*, 42 T.C. 358, 381 (1964), *aff'd*, 355 F.2d 929 (6th Cir. 1966); *see also Corliss v. Bowers*, 281 U.S. 376, 378 (1930); Treas. Reg. § 1.451-2(a).

In determining whether income is constructively received, "[i]t is inconsequential that [the taxpayer] did not personally 'make withdrawals' or 'receive disbursements.'" *Harrington v. Commissioner*, T.C. Memo. 2021-95, 122 T.C.M. (CCH) 116, 121, *aff'd*, No. 22-9000, 2022 WL 17333080 (10th Cir. Nov. 30, 2022). A taxpayer need not actually withdraw cash for a gain to be taxable. *See* Treas. Reg. § 1.451-2(a). However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions. *See ibid.*; *see also Harrington*, 122 T.C.M. (CCH) at 121. A substantial limitation or restriction does not include a limitation the taxpayer himself creates. *See Murphy v. United States*, 992 F.2d 929, 931 (9th Cir. 1993) (holding that a taxpayer constructively received income where "his failure to receive cash was entirely due to his own volition"); *Fairbank v. Commissioner*, T.C. Memo. 2023-19, at \*27 (same); *Harrington*, 122 T.C.M. (CCH) at 121 (same).

[*42] FBI Special Agents Humphreys and Nichilo, who testified very credibly during trial of these cases, undertook during the criminal investigation the initial calculation of the losses that petitioner inflicted on the Senate and Citizens Alliance. During the sentencing phase of the criminal case, the district court relied on their analysis in determining petitioner's restitution obligation. The court estimated that the Senate had suffered an aggregate loss of $2,517,274 and that Citizens Alliance had suffered an aggregate loss of $1,566,528, of which the district court deemed $1,165,317 attributable to petitioner. In the income tax Notice of Deficiency respondent relied heavily on the FBI special agents' analysis, and he later refined their calculations using evidence presented at trial.

Although the exact method the FBI special agents employed depended on the particular type of income, they proceeded in the same general fashion for all items. First, they examined the books and records of the Senate and Citizens Alliance. When they encountered gaps or "holes" in the record, as they frequently did, the FBI special agents subpoenaed information from third-party vendors and contractors. Upon receiving those records, the FBI special agents approached petitioner's former employees to discern the extent to which the transactions benefited petitioner personally.

### A.  *Unreported Income from the Senate*

Petitioner received gross income in the form of personal services rendered to him by employees and contractors paid by the Senate. This income falls into three general categories. First, petitioner engineered inflated salaries for certain staff members to ensure their loyalty and compliance with his demands. By diverting cash to his staff members in excess of their proper compensation under the Senate pay plan, petitioner exercised dominion and control over those funds to benefit himself. We conclude that 100% of this excess compensation was includible in his gross income.

Second, petitioner caused his staff members to devote inordinate amounts of time to tasks that benefited him personally or benefited his political campaigns, his political allies, and political candidates he favored. On the basis of the trial evidence, we estimate the percentage of each employee's time that was so devoted, as opposed to constituting legitimate Senate work. We then determine what amount should be included in petitioner's gross income for this reason.

[*43] Third, petitioner caused the Senate to hire contractors and consultants who rendered the bulk of their services to petitioner and his political campaigns. For the "ghost contractors," who did no legislative work at all, we include 100% of their compensation in petitioner's gross income. For the other contractors, we include a ratable portion of their compensation in his gross income.

1.     *Excess Compensation Engineered by Petitioner*

Petitioner falsely certified to the Senate inflated salaries for eight employees in his Philadelphia and Harrisburg offices. He did so to ensure their loyalty and incentivize them to discharge, without complaint, the personal tasks he incessantly assigned to them. As more fully explained *supra* pp. 18–20, the Senate funds petitioner improperly diverted to his staff in this manner are summarized in the following table:

| Employee | Office | Total Wages per Forms W–2 | Appropriate Wages per Senate Pay Plan | Amount Improperly Diverted to Employee |
|---|---|---|---|---|
| Ruth Arnao | Philadelphia | $287,608 | $116,127 | $171,481 |
| Roseanne Pauciello | Philadelphia | 443,412 | 251,003 | 192,409 |
| Maryann Quartullo | Philadelphia | 201,640 | 144,924 | 56,716 |
| Lillian Cozzo | Philadelphia | 333,111 | 201,113 | 131,998 |
| Lou Leonetti | Philadelphia | 169,006 | 99,254 | 69,752 |
| David Nelson | Philadelphia | 247,527 | 133,168 | 114,359 |
| Charles Sholders | Harrisburg | 218,515 | 104,566 | 113,949 |
| Sue Swett | Harrisburg | 379,964 | 220,915 | 159,049 |
| **Total** | | $2,280,783 | $1,271,070 | $1,009,713 |

We conclude that the excess compensation shown above, totaling $1,009,713, is includible in petitioner's gross income because he exercised dominion and control over these funds by causing the money to be diverted to his employees. The officer who served as chief clerk of the Senate during 2001–2005 testified that he trusted the submissions he received from senators regarding salaries, invoices, and related fiscal matters. He credibly testified that he had no knowledge or reason to

**[\*44]** believe that petitioner's certifications regarding his employees' job qualifications were false.

Given these circumstances, we find that petitioner had, in practical effect, the unfettered ability to direct Senate funds to his employees to ensure that they received (in his words) what he "thought they deserved in way of pay." *See Estate of Geiger v. Commissioner*, 352 F.2d at 231–32 (finding that taxpayer had constructive receipt of income where she was the "force and the fulcrum" behind the misappropriations). Because the chief clerk routinely approved all salary requests from Senators that appeared proper on their face, petitioner's ability to divert funds to his staff was not subject to any "substantial limitations or restrictions." *See* Treas. Reg. § 1.451-2(a); *cf. Leslie v. Commissioner*, T.C. Memo. 2016-171, 112 T.C.M. (CCH) 313, 318 (finding that a substantial limitation existed where the taxpayer's access to funds required a court order to release the money), *aff'd*, 725 F. App'x 597 (9th Cir. 2018).

Petitioner's income tax case resembles *Bailey v. Commissioner*, 52 T.C. 115 (1969), *aff'd per curiam*, 420 F.2d 777 (5th Cir. 1969). The taxpayer in that case misappropriated bank funds and had them deposited directly into her brother's account. We found that the taxpayer had "complete dominion and control over the embezzled funds" and that this was sufficient to make the funds includible in the taxpayer's gross income. *Id.* at 119. We deemed it irrelevant that the taxpayer diverted the funds to her brother rather than keep the money for herself. *Ibid.*

In his Posttrial Briefs, petitioner does not seriously dispute that he engineered inflated salaries for his staff. Nor does he challenge the detailed calculation of the amounts involved. Rather, he urges that "[his] personal wealth did not increase as a result of excess compensation paid to Senate staffers." At most, he says, he received only the "accrual of political capital," which he characterizes as an intangible benefit without quantifiable economic value.

We disagree. By diverting excess compensation to his staff, petitioner garnered more than "political capital." He sought to assure—and he in fact obtained—unquestioning loyalty from his staff, especially when the going got tough. He incentivized his employees' compliance in rendering personal services that directly benefited him and his political allies. And he "bought their silence" about improper or illegal behavior in which he was engaging, including the use of Senate resources for his political campaigns. These benefits plainly had economic value. And

**[\*45]** while the fair market value of these benefits might be hard to calculate in isolation, petitioner has not shown that it was "arbitrary or erroneous" for the Commissioner to use the excess compensation he engineered for his staff as an index of the value he received from them. *See Walquist*, 152 T.C. at 67–68.

Petitioner alternatively contends that the excess compensation should not be taxable to him because his employees presumably paid Federal income tax on the full amounts of their salaries. But this does not negate petitioner's receipt of gross income, as the embezzlement cases show. A taxpayer who embezzles money is taxable on these funds upon receipt. *See Yerkie v. Commissioner*, 67 T.C. 388, 390 (1976) ("Although the proceeds of an embezzlement are not obtained lawfully, they result in economic gains for the embezzler and, as such, are included in his gross income for the year in which the funds were misappropriated." (citing *James*, 366 U.S. 213)).

An embezzler has many choices about what to do with the money that he unlawfully secures. He can keep it, distribute it to family or friends, or use it to pay salaries of contractors or employees. In the latter scenarios, his contractors or employees will presumably pay tax on the payments derived from the embezzled finds. Petitioner cites no authority—and we know of none—for the proposition that this immunizes the embezzler from tax. *See Walters v. Commissioner*, T.C. Memo. 1998-111, 75 T.C.M. (CCH) 2007, 2018–19 ("[A]n embezzler must include embezzled funds in income even though the funds are lent or given to another.").

The same logic applies here. The principal difference between the embezzlement cases and the situation here is that petitioner unlawfully engineered transfers of cash directly from the Senate to his employees, rather than extracting cash from the Senate and distributing it to his employees himself. Petitioner has offered no cogent reason why this should make any difference in determining whether he received gross income. *See Smiley v. Commissioner*, T.C. Memo. 2024-66, at \*29–30; *Wood v. Commissioner*, T.C. Memo. 2011-190, 102 T.C.M. (CCH) 146, 147; *Jackson v. Commissioner*, T.C. Memo. 1994-328, 68 T.C.M. (CCH) 112, 114; *Cruea v. Commissioner*, T.C. Memo. 1985-553, 50 T.C.M. (CCH) 1377, 1380–81.

In short, the manner in which petitioner used the misappropriated funds is immaterial in determining whether those funds were includible in his gross income. By falsely certifying to the chief clerk that

**[*46]** his staff members had job qualifications they did not possess, he diverted Senate funds to his employees in excess of the wages permitted by the Senate pay plan. Because he exercised dominion and control over these funds to benefit himself, those funds are includible in his gross income.

### 2. *Personal Services Rendered to Petitioner*

Petitioner did not adhere to a traditional office structure for his Philadelphia and Harrisburg offices. Employees were expected to perform a multitude of personal and political tasks and be "on call" at any time of day or night. For many of his staff members, there was no distinction between their work for petitioner in his capacities as a sitting Senator, as a private citizen, and as a candidate in a political campaign.

The IRS determined that petitioner is taxable on a ratable portion of certain staff member's salaries, corresponding to the percentage of that person's time devoted to tasks that personally benefited petitioner, his political campaigns, and his political allies. In large part, we find respondent's determinations to be reasonable. With some adjustments we find that petitioner realized gross income from personal and political services rendered by the staff members discussed below.

### a. *Philadelphia District Office*

The Philadelphia district office operated as the constituent services arm of petitioner's Senate office. *See supra* p. 14. Fumo for Senate, petitioner's principal campaign organization, was located on the second floor of the same building. Staff members routinely worked for both, notwithstanding their job descriptions. And their work regularly overlapped with petitioner's other political endeavors and his Citizens Alliance projects. As a result, many employees in the Philadelphia office spent a significant portion of their workday discharging personal or political tasks for petitioner.

Needless to say, the percentage of time thus devoted cannot be estimated with scientific precision. In selecting a reasonable percentage for each employee, we have considered the district court's findings during the sentencing phase of petitioner's criminal case, the transcripts of witness testimony during the criminal trial, the testimony we heard during trial of these cases, and the documentary evidence.

**[*47]**                    i.    *Ruth Arnao*

Ms. Arnao was the linchpin of petitioner's overlapping staffs. Besides making demands on her directly, petitioner routinely funneled his personal directives to other staff members through her. Responding to his personal requests and ensuring that all other staff members did the same was surely time consuming.

However, we do not agree with respondent that 100% of Ms. Arnao's time was spent on tasks that personally benefited petitioner, his political campaigns, and his political allies. Ms. Arnao discharged routine staff management functions for the Philadelphia district office. And she rendered legitimate services to petitioner's constituents. Among other things, she greeted visitors to the district office, arranged meetings, funneled constituent requests to the proper channels, notarized papers for constituents, and handled licensing issues that residents brought to her attention.

While agreeing that Ms. Arnao did render legitimate constituent services, respondent urges that she invariably did so wearing her "Citizens Alliance hat" rather than her "Senate hat." We reject that argument. During 2001–2004 Ms. Arnao physically worked in the district office for a good portion of most workdays. Her trial testimony, which we found credible, convinced us that she rendered a significant portion of her constituent services through the district office. Making our best estimate based on the evidence we heard, we find that Ms. Arnao devoted 35% of her time to legitimate Senate business and 65% of her time to tasks that benefited petitioner personally.

Ms. Arnao received total compensation of $287,608 from the Senate during 2001–2004. We conclude that 65% of that amount, or $186,945, is includible in petitioner' gross income. We have already determined that $171,481 of her wages is includible in his gross income as excess compensation that he engineered for her. *See supra* p. 43. To prevent double counting, we subtract the latter number from the former and calculate $15,464 as the additional amount includible in his gross income.

                    ii.    *Roseanne Pauciello*

Ms. Pauciello was a longtime friend of petitioner and a ward leader in his Senate district. When she was not summering at her home on the New Jersey shore, we find that she spent nearly all her time assisting petitioner with his political activities and tending to his personal

**[*48]** affairs. Mr. Cain, petitioner's chief political consultant, was unaware that Ms. Pauciello earned a Senate salary because (as far as he could tell) she worked exclusively on political matters. Her subordinate Ms. Quartullo, who testified in petitioner's criminal trial, could not identify any Senate work Ms. Pauciello performed apart from limited constituent work and meetings with "committee people." Making our best estimate based on the evidence we heard, we find that Ms. Pauciello devoted 20% of her time to legitimate Senate business and 80% of her time to tasks that benefited petitioner personally.

Ms. Pauciello received total compensation of $443,412 from the Senate during 2001–2005. We conclude that 80% of that amount, or $354,730, is includible in petitioner' gross income. We have already determined that $192,409 of her wages is includible in his gross income as excess compensation he engineered for her. *See supra* p. 43. To prevent double counting, we subtract the latter number from the former and calculate $162,321 as the additional amount includible in his gross income.

### iii. *Maryann Quartullo*

Ms. Quartullo held a secretarial position in the Philadelphia district office, working as Ms. Pauciello's subordinate. The evidence established that Ms. Quartullo devoted significant time to bookkeeping for petitioner's personal business activities and campaign accounting for petitioner and his political allies. She also devoted considerable time to purchasing consumer goods that petitioner requested. On the other hand, she appears to have performed legitimate secretarial services for Ms. Pauciello and to have rendered meaningful constituent services. Making our best estimate based on the evidence we heard, we find that Ms. Quartullo devoted 60% of her time to legitimate Senate business and 40% of her time to tasks that benefited petitioner personally.

Ms. Quartullo received total compensation of $201,640 from the Senate during 2001–2005. We conclude that 40% of that amount, or $80,656, should reasonably be included in petitioner' gross income. However, the adjustment respondent has determined with respect to Ms. Quartullo is limited to $56,716, the excess compensation he engineered for her. *See supra* p. 43. Treating that determination as a concession, we hold that petitioner must include in gross income only $56,716 on account of services rendered by Ms. Quartullo.

**[\*49]**                                        iv.     *Lillian Cozzo*

Ms. Cozzo made petitioner's travel arrangements, including vacation travel plans for him, his girlfriends, and other friends who accompanied him.  She ran errands and scheduled meetings for petitioner's political campaign and the campaigns of other candidates.  But the evidence established that she performed legitimate work for the Senate, which included rendering constituent services, keeping track of petitioner's daily schedule when he was in Philadelphia, and maintaining a log of Philadelphia district office employees' leave balances.  Making our best estimate based on the evidence we heard, we find that Ms. Cozzo devoted 50% of her time to legitimate Senate business and 50% of her time to tasks that benefited petitioner personally.

Ms. Cozzo received total compensation of $333,111 from the Senate during 2001–2005.  We conclude that 50% of that amount, or $166,556, should reasonably be includible in petitioner' gross income. However, the adjustment respondent has determined with respect to Ms. Cozzo is limited to $131,998, the excess compensation he engineered for her.  *See supra* p. 43.  Treating that determination as a concession, we hold that petitioner must include in gross income only $131,998 on account of services rendered by Ms. Cozzo.

v.     *Jamie Spagna and Gina Novelli*

Ms. Spagna and Ms. Novelli had largely overlapping duties, focusing chiefly on petitioner's personal and business affairs.  Both served as assistants to Ms. Arnao and undertook bookkeeping and campaign accounting for petitioner or his political allies.  They ran errands for petitioner and planned and executed his biannual political fundraisers under Ms. Arnao's direction.  Ms. Spagna was primarily responsible for purchasing—and shipping to petitioner at his various residences and vacation destinations—the tools and consumer goods that he desired.  In an email explaining the duties Ms. Novelli and Ms. Spagna were expected to perform, Ms. Arnao listed 17 specific tasks.  Not a single task referred to legitimate Senate work.

Respondent appears to contend that Ms. Spagna and Ms. Novelli devoted 100% of their time to petitioner's personal and political affairs. We find that allocation untenable.  They could not have spent the entirety of every work week on non-Senate-related tasks.  Both credibly testified that they attended to various constituent requests and participated in community meetings.  Making our best estimate based on the

[*50] evidence we heard, we find that Ms. Spagna and Ms. Novelli devoted 40% of their time to legitimate Senate business and 60% of their time to tasks that benefited petitioner personally.

Ms. Spagna and Ms. Novelli received from the Senate during 2001–2005 total wages of $167,119 and $57,018, respectively. Neither received any excess compensation. We accordingly include in petitioner's gross income 60% of their aggregate wages, or $100,271 and $34,211, respectively.

### vi. *Lou Leonetti*

Mr. Leonetti was one of petitioner's drivers in the Philadelphia district office. We find that the bulk of his chauffeuring activity related to petitioner's personal and political affairs rather than his legitimate Senate business. Apart from chauffeuring petitioner, his duties consisted of running errands and performing clerical tasks. Respondent contends that Mr. Leonetti devoted 60% of his time to petitioner's personal and political affairs, and we find this percentage reasonable.

Mr. Leonetti received total compensation of $169,006 from the Senate during 2001–2005. We conclude that 60% of that amount, or $101,404, should reasonably be includible in petitioner' gross income. However, the adjustment respondent has determined with respect to Mr. Leonetti is limited to $69,752, the excess compensation petitioner engineered for him. *See supra* p. 43. Treating that determination as a concession, we hold that petitioner must include in gross income only $69,752 on account of services rendered by Mr. Leonetti.

### vii. *David Nelson*

Mr. Nelson was petitioner's other driver in the Philadelphia district office. We find that the bulk of his chauffeuring activity related to petitioner's personal and political affairs rather than his legitimate Senate business. Apart from chauffeuring petitioner, his duties consisted of running errands and performing clerical tasks. Respondent contends that Mr. Nelson devoted 60% of his time to petitioner's personal and political affairs, and we find this percentage reasonable.

Mr. Nelson received total compensation of $247,527 from the Senate during 2001–2005. We conclude that 60% of that amount, or $148,516, should reasonably be includible in petitioner' gross income. However, the adjustment respondent has determined with respect to Mr. Nelson is limited to $114,359, the excess compensation petitioner

**[\*51]** engineered for him. *See supra* p. 43. Treating that determination as a concession, we hold that petitioner must include in gross income only $114,359 on account of services rendered by Mr. Nelson.

### viii. *Lisa Costello*

Lisa Costello was a staff member in petitioner's Philadelphia satellite office at Eighth and Clearfield Streets. Apart from her Senate work, she provided housecleaning services for petitioner at his Green Street home. Respondent determined that she devoted 25% of her time to these housekeeping duties. We find that allocation reasonable, particularly since respondent has not sought any allocation for housecleaning services provided by Ms. Barrett. *See supra* p. 27. Ms. Costello received from the Senate during 2001 total wages of $28,964. She received no excess compensation. We accordingly include in petitioner's gross income 25% of her wages, or $7,241.

### ix. *Petitioner's Arguments*

Petitioner advances four principal arguments against the conclusions reached above. First, he seeks to diminish the amount of time his employees spent managing his personal, business, financial, and political affairs. However, the evidence at trial established that his Philadelphia district office staff completed all the accounting and recordkeeping for his personal investments, his law firm expenses, his vacation properties, his Riverview Farm, his political campaigns, and his PACs. They did all the accounting for Citizens Alliance, its subsidiaries, and their real estate holdings. They did significant accounting work for the PACs and campaigns of his political allies. Apart from performing accounting services, making disbursements, and the like, petitioner's employees were required to produce periodic summary reports for his use. And they spent countless hours discharging the personal tasks he repeatedly assigned to them. The value of these services constitutes gross income to petitioner. He is correct that the precise allocation of his employees' time cannot be calculated with mathematical precision. But he has not shown by a preponderance of the evidence that the Commissioner's reconstruction of his income (as modified by the adjustments we have made) was "arbitrary or erroneous." *See Walquist*, 152 T.C. at 67–68.

Second, petitioner urges that his employees performed the services described above as volunteers, or that they did all this work outside of their Senate workday. Their uniform testimony at trial was to the contrary. His staffers viewed these personal and political tasks as part

**[\*52]** of their job duties. They did not regard their fulfillment of these tasks as gifts or favors to petitioner.

Third, petitioner contends that the percentage of staff time devoted to personal and political tasks, while indicative of the loss incurred by the Senate, has no relevance in determining his gross income. Again we disagree. "Gross income includes income realized in any form, whether in money, property, or services." Treas. Reg. § 1.61-1(a). Petitioner derived an economic benefit equal to the fair market value of the personal and political services provided to him by his staff. He would have had to pay out of pocket for these services had his staff not provided the services at Senate expense.

Finally, petitioner contends that he should not be taxable on the value of services rendered by his staff to his family members, his girlfriends, his political allies, and other third parties. As explained above, however, it is ultimately irrelevant where petitioner chose to divert the misappropriated funds. *See supra* pp. 45–46. Services rendered to petitioner's family members and girlfriends are taxable to the same extent as services rendered to petitioner himself. *See Estate of Geiger v. Commissioner*, 352 F.2d at 231–32; *Bailey*, 52 T.C. at 119. And he would not have directed staff to render services to his political allies—the other objects of his bounty—unless he thought he would profit thereby. We reject his argument that gaining such "political capital" was an intangible benefit that had no economic value.

b. *Harrisburg Offices*

i. *Charles Sholders*

Mr. Sholders served as petitioner's driver in Harrisburg and as the manager of petitioner's Riverview Farm. His involvement with the farm became so demanding that he and his wife eventually moved onto the property. He cared for the horses, made 4-hour roundtrips to purchase farm equipment, oversaw the planting of crops, and facilitated delivery of Citizens Alliance equipment to the farm. He performed these tasks during his Senate workday because most work needed to be completed during daylight hours when contractors were available. He spent about 80% of his workday on the farm when the Senate was not in session. When the Senate was in session, he performed clerical work and served as petitioner's driver. Respondent determined that he devoted 80% of his time to tasks that benefited petitioner personally. We find a 70% allocation to be reasonable in the light of the trial evidence.

[*53] Mr. Sholders received total compensation of $218,515 from the Senate during 2001–2005. We conclude that 70% of that amount, or $152,961, should reasonably be includible in petitioner' gross income. However, the adjustment respondent has determined with respect to Mr. Sholders is limited to $113,949, the excess compensation petitioner engineered for him. *See supra* p. 43. Treating that determination as a concession, we hold that petitioner must include in gross income only $113,949 on account of services rendered by Mr. Sholders.

### ii.  *Sue Swett*

Ms. Swett, petitioner's longtime secretary in the Harrisburg district office, performed duties similar to those discharged by Ms. Arnao and Ms. Cozzo in Philadelphia. She made dinner and travel reservations, ordered various consumer goods as petitioner desired, and funneled personal requests from petitioner to the relevant Harrisburg staff members. She acted as a liaison for petitioner for all work being completed on the farm, whether by Senate staffers, petitioner's personal staff, or independent contractors. She spent portions of her Senate workday ordering farm equipment. And she visited the farm almost daily—usually during Senate work hours—and updated petitioner on the progress of various projects. Respondent contends that she devoted 80% of her time to tasks that benefited petitioner personally. That allocation seems high to us; we find that a reasonable allocation is 65%, the same figure we have determined for Ms. Arnao.

Ms. Swett received total compensation of $379,964 from the Senate during 2001–2005. We conclude that 65% of that amount, or $246,977, should reasonably be includible in petitioner' gross income. However, the adjustment respondent has determined with respect to Ms. Swett is limited to $159,049, the excess compensation petitioner engineered for her. *See supra* p. 43. Treating that determination as a concession, we hold that petitioner must include in gross income only $159,049 on account of services rendered by Ms. Swett.

### iii.  *Gerald Sabol*

Mr. Sabol was a budget analyst on the SDAC staff in Harrisburg. In 2003 he became deeply involved in Riverview Farm. His responsibilities included the "layout of the pastures and fields, planting and fertilizing, caring for and feeding livestock, rehabilitating structures on the farm, fencing, creating a pond, and designing barns." Farm matters needed to be addressed during the workday, and Mr. Sabol indicated in

[*54] emails to Mr. Dlugolecki (the chief of staff) that he had little time to complete Senate budget work because of the toll the farm was taking on him. Respondent determined that Mr. Sabol spent 60% of his Senate workday on farm-related business for petitioner. Petitioner does not dispute that percentage allocation, which we deem conservative.

Mr. Sabol received from the Senate during 2003 total wages of $78,372. He received no excess compensation. We accordingly include in petitioner's gross income 60% of his wages, or $47,023.

### iv. *Daniel Coyne*

Mr. Coyne was an IT specialist on the SDCS staff in Harrisburg. He provided some IT support to petitioner's Harrisburg office, but he rendered most of his services to petitioner personally. He performed regular maintenance—including software and security updates, network extensions and repairs, and the addition of new functionality—to the computer and cell phone networks in petitioner's homes, cars, vacation destinations, and Riverview farm.

Mr. Coyne also devoted significant time to political campaigns in which petitioner had an interest. Petitioner offered Mr. Coyne's computer services to Bob Casey's gubernatorial campaign. Mr. Coyne configured the campaign email server, set up computers and telephones, and secured campaign worksites. The evidence in the criminal trial indicated that this campaign work "consumed" Mr. Coyne, and he testified that it was "a very tough time." Mr. Coyne then transitioned into a support role for petitioner's 2004 reelection campaign, in which Senate employees were "all hands on deck." Respondent determined that Mr. Coyne devoted 50% of his Senate workday to tasks benefiting petitioner, and we find this allocation reasonable, indeed conservative.

Mr. Coyne received from the Senate during 2001 and 2002 total wages of $50,503. He received no excess compensation. We accordingly include in petitioner's gross income 50% of his wages, or $25,252.

### v. *Don Wilson*

Mr. Wilson was employed as a computer specialist for SCDS during 2001–2005, but he was stationed in the Philadelphia district office. Petitioner regarded Mr. Wilson as one of his personal IT assistants. Mr. Wilson spent many hours providing computer assistance, not only to petitioner, but to his family, friends, girlfriends, political allies, and favored political candidates. Mr. Wilson installed wireless networks,

[*55] routers, computers, printers, stereo systems, video game boxes, security cameras, and other equipment at petitioner's Green Street home and his Ventnor and Margate beach properties. He made three 5-day trips to Florida and two trips to Martha's Vineyard to perform similar tasks there. He installed and repaired radios, DVD players, and GPS systems in petitioner's cars and in the vehicles used by his family and girlfriends.

The scale of Mr. Wilson's services to petitioner ratcheted up in 2004 and 2005. He spent long hours providing computer and IT services to petitioner's 2004 reelection campaign and to campaigns of four other candidates petitioner favored. When petitioner was alerted to the FBI investigation, he tasked Mr. Wilson (along with Mr. Luchko) with implementing "wiping" programs on computers and ensuring staff compliance with petitioner's security directives.

Respondent determined that Mr. Wilson during 2001–2003 devoted 30% of his Senate workday to tasks benefiting petitioner personally. This percentage rose to 60% during 2004 and 50% in 2005. Petitioner has not shown these allocations to be unreasonable. The allocations determined by respondent produce a weighted average of roughly 43% as applied to Mr. Wilson's aggregate 5-year salary.

Mr. Wilson received from the Senate during 2001–2005 total wages of $204,327. He received no excess compensation. We accordingly include in petitioner's gross income roughly 43% of his wages, or $88,058.

### vi. *Petitioner's Arguments*

Petitioner does not dispute that the five staff members listed above provided personal services to him, and he has not shown that the allocation percentages we have determined are unreasonable. Rather, he advances substantially the same arguments that he urged when insisting that excess compensation he engineered for his employees should not be included in his gross income. He contends that his staff members performed their services as volunteers or outside their normal Senate workday, that he should not be taxable on services rendered to his family, friends, and political allies, and that his employees' behavior, while relevant in ascertaining the loss incurred by the Senate, is irrelevant in determining his gross income. We have rejected these arguments previously, *see supra* pp. 51–52, and we reject them again now.

**[\*56]** In making these percentage allocations from petitioner's Philadelphia and Harrisburg staffs, we acknowledge that our estimates are necessarily just that—estimates. But we note that the IRS did not make *any allocations* from other staff members who rendered political and/or personal services to petitioner. Four other members of the district office—Mr. Engelke, Ms. Freeland, Mr. Hawkins, and Ms. Kirby—regularly performed campaign-related activities for petitioner and/or data entry for contributions to his political campaigns. *See supra* p. 15. Mr. Marrone performed significant work relating to petitioner's political campaigns and supervised the renovation and remodeling of his Green Street home. *See supra* pp. 10, 14–15. Gary Tuma from the Harrisburg office likewise assisted petitioner with his political campaigns. *See supra* p. 16. Mr. Craig, a Senate attorney, assisted him with the Jubelirer lawsuit and the Ventnor Dunes Project. *See supra* pp. 24, 31. Messrs. Luchko and Eister, both employed by SDAC, served as petitioner's personal IT assistants and spent many hours implementing the computer wiping programs he directed. *See supra* pp. 21–22, 32–33. To the extent the IRS refrained from imputing gross income to petitioner on account of these other staffers' work, its aggregate allocations were conservative (i.e., favorable to petitioner).

Summarizing our conclusions above, we find that petitioner for 2001–2005 must include $1,489,554 of unreported income with respect to services performed by his Philadelphia and Harrisburg staff. Of this total, $1,009,713 represents the excess compensation he diverted to 8 employees. *See supra* p. 43. The balance, or $479,841, represents percentage allocations to account for time his staff devoted to his personal matters, his political activities, and the activities of his political allies. *See supra* pp. 46–55. The results are shown in the table below:

| *Employee* | *Office* | *Form W–2 Wages* | *Excess Compensation* | *Additional Time-Based Allocation* | *Total Gross Income to Petitioner* |
|---|---|---|---|---|---|
| Ruth Arnao | Philadelphia | $287,608 | $171,481 | $15,464 | $186,945 |
| Roseanne Pauciello | Philadelphia | 443,412 | 192,409 | 162,321 | 354,730 |
| Maryann Quartullo | Philadelphia | 201,640 | 56,716 | -0- | 56,716 |
| Lillian Cozzo | Philadelphia | 333,111 | 131,998 | -0- | 131,998 |
| Lou Leonetti | Philadelphia | 169,006 | 69,752 | -0- | 69,752 |
| David Nelson | Philadelphia | 247,527 | 114,359 | -0- | 114,359 |
| Charles Sholders | Harrisburg | 218,515 | 113,949 | -0- | 113,949 |
| Sue Swett | Harrisburg | 379,964 | 159,049 | -0- | 159,049 |
| Jamie Spagna | Philadelphia | 167,119 | – | 100,271 | 100,271 |

| [*57] | | | | | |
|-------|-----------|---------|---|---------|---------|
| Gina Novelli | Philadelphia | 57,018 | – | 34,211 | 34,211 |
| Lisa Costello | Philadelphia | 28,964 | – | 7,241 | 7,241 |
| Gerald Sabol | Harrisburg | 78,372 | – | 47,023 | 47,023 |
| Daniel Coyne | Harrisburg | 50,503 | – | 25,252 | 25,252 |
| Don Wilson | Philadelphia | 204,327 | – | 88,058 | 88,058 |
| **Total** | – | – | **$1,009,713** | **$479,841** | **$1,489,554** |

### 3. *Senate Contractors*

By virtue of his official positions, petitioner was able to direct the hiring of independent contractors who were paid by the Senate. Most of these contractors did little or no actual legislative work. To the extent they performed services at all, those services were rendered chiefly to petitioner personally, to his political campaigns, and to the campaigns of other politicians he supported. Petitioner falsely submitted these contracts for approval by the chief clerk knowing that little to no Senate work would occur.

### a. *Frank Wallace*

Mr. Wallace was retained by the Senate as a contractor from the early 1990s through 2005. The stated purpose of his contract was to serve as "Private Investigator" who would provide consulting and "information analysis" to SDAC. Beginning in 2001 or earlier, however, Mr. Wallace's mission was to render private investigation and related services to petitioner.

Some assignments that petitioner directed to Mr. Wallace involved investigating people in his personal life, e.g., his ex-wives, his ex-girlfriends, and his butler. Other assignments involved efforts to gather dirt on petitioner's political foes or personal enemies. Mr. Wallace, for example, was directed to investigate public officials who had criticized petitioner and complaints made to police about a dumpster on petitioner's property. Mr. Wallace swept petitioner's home and offices for listening devices or "bugs." And he often provided physical security for political candidates whom petitioner supported.

Respondent contends that 100% of Mr. Wallace's time was devoted to tasks that benefited petitioner in his personal capacity. That allocation seems high: It seems that Mr. Wallace occasionally did provide physical security to petitioner when outside the office on legitimate Senate business. We find a reasonable allocation to be 90%.

**[*58]**                    b.    *Howard Cain*

Mr. Cain was retained as an independent contractor by the Senate after a brief stint as a Fumo for Senate volunteer. He contracted through his business, Venture Analysis. The contract recited that Mr. Cain would provide consulting services on local community and governance issues. But he devoted essentially all his time during 2001–2005 to personal and political campaign work for petitioner and his political allies. According to Mr. Cain, his contract omitted the actual purpose of his work because petitioner "couldn't have the state pay for political campaigns."

Mr. Cain's testimony indicated that he may have performed some legitimate work for the Senate. But his testimony was vague about when that work occurred, and it appeared to us that it occurred mainly during the 1980s and 1990s. Petitioner in his Posttrial Briefs does not cite a single example of any legitimate Senate work performed by Mr. Cain during 2001–2005, the tax years at issue.

Two members of the Philadelphia office staff testified during the criminal case that Mr. Cain performed services as a "political consultant" for petitioner. *See supra* p. 24. The political character of his work is highlighted by his involvement in the Jubelirer lawsuit and the Ventnor Dunes project. *See supra* pp. 24, 31. In both cases he sought to advance petitioner's personal position, while being paid by Citizens Alliance. Petitioner has not carried his burden of proving that respondent erred in treating 100% of the services rendered by Mr. Cain under his Senate contract as benefiting petitioner personally.

c.    *Philip Press*

Mr. Press was retained as an independent contractor by the Senate during 2002–2005. Petitioner met him while he was working on the Casey for Governor campaign. After brief service on petitioner's district office staff, he was given a series of Senate contracts at petitioner's direction. These contracts said that Mr. Press would provide consulting services regarding "e-commerce issues" and "community governance issues."

In fact, Mr. Press's services consisted almost entirely of political campaign work, for both petitioner and his political allies. Mr. Cain described him as a "foot soldier" for petitioner, i.e., someone who accompanied petitioner to political events and performed miscellaneous tasks for him. A witness during the criminal trial described him as a "body man"

**[*59]** and "foot soldier" who performed political tasks for petitioner, his political allies, and political candidates he favored.

Mr. Press represented in a 2003 email to chief of staff Mr. Dlugolecki that he had done no legislative work. Ms. Quartullo and Ms. Spagna knew that Mr. Press was involved in "political campaigns" and could identify no legislative work he had performed. Like Mr. Cain, Mr. Press assisted petitioner by promoting candidates whom petitioner favored and opposing candidates whom petitioner disliked.

Petitioner in his Posttrial Briefs cites only one example of legitimate Senate work that Mr. Press performed during 2002–2005. Respondent determined that 100% of the services Mr. Press performed under his Senate contracts benefited petitioner personally. Petitioner has not carried his burden of proving that allocation to be unreasonable.

d.   *Michael Palermo*

Mr. Palermo was one of the two "ghost contractors" to whom petitioner awarded (or caused to be awarded) Senate consulting contracts. During 2000–2004 he was hired as a consultant to provide SDAC with "fiscal and operational analysis of interstate transportation issues." He in fact performed no services whatsoever for the Senate.

During legislative sessions, Mr. Palermo regularly hosted petitioner at his Hummelstown residence. When petitioner expressed interest in owning a farm, Mr. Palermo helped make that happen. He attended the auction to purchase Riverview Farm, oversaw eviction of the existing tenant, supervised renovation and repairs, planned crop rotations, managed invoices, and arranged for the purchase of needed equipment. His monthly invoices supplied no detail regarding the nature of his work, simply stating that he had devoted a specific number of hours to "services rendered." He eventually pleaded guilty to Federal conspiracy charges arising from his receipt of this no-work contract arranged by petitioner.

Respondent determined that 100% of the services Mr. Palermo performed under his Senate contract benefited petitioner personally. Petitioner has identified no legitimate work Mr. Palermo actually performed for the Senate during 2001–2004. We accordingly find respondent's allocation to be reasonable.

**[\*60]**                    e.    *Mitchell Rubin*

Mr. Rubin was a close friend of petitioner and the eventual husband of Ms. Arnao.  With Fred Blum he owned and operated B&R, which supplied support services for law offices.  Mr. Rubin was an important political fundraiser for petitioner and his political allies, particularly those campaigning for judicial office.

Beginning in October 1999 petitioner caused SDAC to contract with B&R to provide "research . . . [and] constituent service."  Under this contract Mr. Rubin was paid $30,000 annually for four years.  To the extent Mr. Rubin provided any services at all, they were not rendered to SDAC, but to petitioner and his political allies.  Like Mr. Palermo, he submitted monthly invoices to SDAC that simply stated "services rendered" and the dollar amount of the invoice.

No member of the SDAC staff, petitioner's Harrisburg staff, or petitioner's Philadelphia district office could identify any work Mr. Rubin or B&R had performed for the Senate.  In 2010 Mr. Rubin pleaded guilty to obstruction of justice charges arising from his receipt of this no-work contract arranged by petitioner.

We find that Mr. Rubin performed no services for the Senate.  Rather, petitioner used the contract as a tool to divert Senate funds to Mr. Rubin as a reward for his friendship, political assistance, and fundraising services.  In his Posttrial Brief petitioner points to a filing by the Federal government in Mr. Rubin's criminal case which suggests that Mr. Rubin acted as a "liaison" between petitioner's Senate office and other entities.  Contrary to petitioner's view, this observation supplies no evidence that Mr. Rubin performed Senate-related work, and petitioner has failed to cite a single example of any legislative tasks Mr. Rubin actually discharged.  We accordingly sustain respondent's determination that 100% of the services Mr. Rubin performed under his Senate contract benefited petitioner personally.

In the income tax Notice of Deficiency respondent calculated the amounts received by each contractor in the same fashion as the amounts received by Senate employees, by taking the *average* of the total amounts shown on the summary charts for each contractor and including that amount in petitioner's gross income for each year. Additionally, because the contracts were awarded at various times during the calendar year, these amounts did not tally with the payments actually received by the contractors during 2001–2005.  Respondent refined his

**[*61]** calculations in his first Amended Answer using the Senate-issued contracts to correct these errors. Applying the percentage allocations we have determined against the corrected amounts of the Senate's annual payments to each contractor, we determine additional inclusions in petitioner's gross income as follows:

| Employee | 2001–2005 Contract Payments | Benefit to Petitioner | Gross Income to Petitioner |
|---|---|---|---|
| Frank Wallace | $199,564 | 90% | $179,608 |
| Howard Cain | 386,750 | 100 | 386,750 |
| Philip Press | 165,625 | 100 | 165,625 |
| Michael Palermo | 229,500 | 100 | 229,500 |
| Mitchell Rubin | 112,500 | 100 | 112,500 |
| **Total** | – | – | **$1,073,983** |

### B. *Unreported Income from Citizens Alliance*

Although organized as a public charity, Citizens Alliance operated largely as a "constituent service" arm of petitioner's Philadelphia district office. But besides rendering services to local residents, Citizens Alliance conferred numerous benefits on petitioner, his personal friends, and his political allies. These included tools, consumer goods, farm equipment, legal services, political polling, and travel expenses.

### 1. *Tools*

Petitioner used Citizens Alliance to fund the collections of tools he amassed at his residences. These tools were ordered online by his staff members in Philadelphia and Harrisburg. The resulting expenses were defrayed by Citizens Alliance, generally by charges to its credit cards.

Given the destruction of most Citizens Alliance records by petitioner's "wiping" programs, FBI Special Agent Humphreys subpoenaed the vendors from whom the tools were purchased. Mr. Burris, the foreman at Citizens Alliance, helped the FBI determine which purchases were for the benefit of the organization rather than petitioner personally. The FBI special agents were conservative in allocating tool purchases to petitioner. For example, if tools were purchased online, shipped to the New Jersey shore, or purchased in multiple matched sets, the FBI special agents presumed they were for petitioner's benefit.

**[\*62]** On the basis of the FBI's reconstruction, the IRS determined that petitioner during 2001–2004 diverted the following amounts from Citizens Alliance to purchase tools for his own use:

| Year | Dollar Value of Tools |
|------|----------------------:|
| 2001 | $29,328 |
| 2002 | 13,751 |
| 2003 | 19,721 |
| 2004 | 3,690 |
| **Total** | **$66,490** |

At trial and in his Posttrial Briefs, petitioner admits to having received the tools. He concedes that the aggregate purchase price for the tools constitutes taxable income to him, and he does not dispute the dollar amounts shown above. We accordingly sustain respondent's determination that these amounts are includible in his gross income for 2001–2004.

### 2.    *Consumer Goods*

Petitioner used Citizens Alliance to fund the purchase of other consumer goods. During the summer he and Ms. Arnao hosted weekly barbeques and two major parties at his New Jersey beach properties. Up to 100 guests were invited, including personal friends, campaign contributors, and political allies. He and Ms. Arnao purchased groceries and supplies for these parties with shopping sprees at nearby retailers, typically financed at Citizens Alliance's expense.

On visits to Sam's Club petitioner and Ms. Arnao charged to Citizens Alliance's credit cards other personal items they desired. Petitioner selected additional consumer goods from catalogs or retail websites and directed his Senate staff to have them shipped to him. Citizens Alliance was likewise charged for these items, which included such diverse items as vacuum cleaners, a camcorder, mapping software, leather goods, items for petitioner's boats, a Weber grill, and hairspray.

On the basis of evidence compiled by FBI Special Agent Nichilo respondent determined that petitioner during 2001–2004 diverted the following amounts from Citizens Alliance to purchase consumer goods for his use:

[*63]

| Year | Dollar Value of Consumer Goods |
|---|---|
| 2001 | $8,979 |
| 2002 | 10,653 |
| 2003 | 3,882 |
| 2004 | 508 |
| **Total** | **$24,022** |

In his Posttrial Brief, petitioner conceded that "certain Citizens Alliance expenditures . . . specifically . . . consumer goods . . . may constitute income." He acknowledged as much at trial, and he offered no evidence to counter the amounts shown above. We accordingly sustain respondent's determination that these amounts are includible in his gross income for 2001–2004.

### 3. *Farm Equipment*

During 2003 petitioner directed that Citizens Alliance provide or purchase farm equipment for his personal use on Riverview Farm. He also directed that Citizens Alliance fund the repair of certain equipment. These outlays included:

- Purchase of a bulldozer for $27,000 after Mr. Jack informed petitioner that he required this equipment to excavate the property;[5]

- Repairs to the bulldozer totaling $16,000, five months after it was purchased;

- A Polaris ATV owned by Citizens Alliance that was used on the farm during 2003;

- A backhoe owned by Citizens Alliance that remained on the farm from June through October 2003 and required repairs exceeding $1,000;

- A Bobcat owned by Citizens Alliance that remained on the farm from June 2003 through February 2005; and

- A dump truck owned by Citizens Alliance that remained on the farm for approximately two months during 2003.

---

[5] The used bulldozer was evidently not worth $27,000. *See supra* p. 27. But that was the amount Citizens Alliance paid at petitioner's direction.

[*64] FBI Special Agent Nichilo calculated fair rental values for the Citizens-Alliance-owned equipment that was shuttled to the farm. For this purpose he calculated rental rates using the Blue Book for Construction Equipment, which publishes rental figures for such items. He then multiplied the applicable rate by a conservative estimate of how long the equipment remained on the farm.

In the Notice of Deficiency respondent determined that petitioner received $48,237 in gross income from the purchase of the bulldozer, repairs to it, and accessories purchased and added to the Polaris ATV. In his Second Amendment to Answer respondent alleged an increased deficiency of $20,422 to account for the fair rental values of the backhoe, the Bobcat, and the dump truck, which were omitted from the Notice of Deficiency. (Respondent excluded the purchase price of the Polaris ATV itself, evidently because it was acquired many years previously and fully depreciated.) The total amount of gross income that respondent asserts for 2003 is thus $68,659.

We find that petitioner recognized gross income in an amount equal to what Citizens Alliance paid to purchase and repair the bulldozer. Although he insists that the bulldozer was meant to return to Philadelphia for Citizens Alliance's use, we are not convinced. Citizens Alliance had no use for a bulldozer. The projects it completed using its own laborers were limited to neighborhood beautification and repairs; it invariably contracted out major projects that would require excavation. Ms. Arnao's testimony at trial confirmed that a bulldozer could not fit through the narrow streets of South Philadelphia where Citizens Alliance's garage was located. We find that the bulldozer was purchased solely for petitioner's benefit and that the cost of purchasing and repairing it constituted gross income to him. *See Estate of Geiger v. Commissioner*, 352 F.2d at 231 ("Income . . . is not restricted to cold cash in a taxpayer's fist."). Likewise, the accessories mounted to the Polaris ATV for use on his farm constitute income to him, as they were never used to benefit Citizens Alliance.

In his Posttrial Briefs petitioner acknowledges that he used the backhoe, the Bobcat, and the dump truck on his farm. But he urges that he derived no taxable benefit because he was simply "borrowing" the equipment. In the real world one does not "borrow" heavy-duty construction equipment; one rents it. By "borrowing" the equipment petitioner saved thousands of dollars by avoiding the need to hire contractors to complete the work that Mr. Jack was doing on the farm. Petitioner is taxable on the fair rental values of the equipment whose use he

[*65] enjoyed. *See, e.g.*, *Hornung v. Commissioner*, 47 T.C. 428, 437, 440 (1967) (finding that the taxpayer's "free use" of two Ford Thunderbird convertibles constituted gross income).

Respondent bears the burden of proof with respect to the fair rental values of the backhoe, the Bobcat, and the dump truck. We find that he has satisfied this burden. For all the equipment in question, we sustain respondent's determination that $68,659 is includible in petitioner's 2003 gross income on account of farm equipment funded by Citizens Alliance.

4.      *Cell Phone Expenses*

During 2002–2004 Citizens Alliance paid the cell phone bills for Nicole Fumo (petitioner's daughter), Mr. Marrone (his son-in-law), and Messrs. Nelson and Leonetti (his two drivers in Philadelphia). In his Second Amendment to Answer, respondent alleged increased deficiencies on the ground that the expenses thus paid by Citizens Alliance constituted gross income to petitioner. Respondent based these amounts on the trial testimony and account records introduced into evidence at trial, as follows:

| *Year* | *Gross Income to Petitioner* |
|---|---|
| 2002 | $3,982 |
| 2003 | 2,245 |
| 2004 | 2,665 |
| **Total** | **$8,892** |

The Senate did not authorize the issuance of Senate phones to members' chauffeurs, who were not supposed to be on the Senate payroll anyway. And the Senate did not authorize the issuance of cell phones to Senators' family members or low-level staff (Mr. Marrone was so employed until 2002). But petitioner wished to have these four people at his beck and call immediately. Unwilling to pay the cost of their cell phone service himself, he directed Citizens Alliance to pay the freight. Doing so had no rational connection to its charitable mission.

We conclude that petitioner realized an economic benefit by deploying Citizens Alliance's funds to finance cell phone service for his daughter, his son-in-law, and his two drivers. *See Estate of Geiger v. Commissioner*, 352 F.2d at 231 ("These beneficiaries were the objects of [his] bounty, not the [organization's]."). Petitioner plainly benefited by

[*66] guaranteeing that his chauffeurs could respond to his directives at once. And he benefited by ensuring instantaneous communication with his daughter and with Mr. Marrone (who was charged with supervising renovations to the Green Street home).

Petitioner urges that the cell phone owner was the direct beneficiary of the subsidized phone service. While that may be true, petitioner was the indirect beneficiary. *See Bailey*, 52 T.C. at 119. He exercised dominion and control over Citizens Alliance's funds to provide free cell phone service to the objects of his bounty. That is sufficient to include these amounts in his gross income. Finding that respondent has carried his burden of proof on this point, we sustain the inclusion of an additional $8,892 in petitioner's gross income for 2002–2004.

5. *Vehicles*

Through Eastern Leasing, its for-profit subsidiary, Citizens Alliance purchased six vehicles at petitioner's direction:

- A Ford Ranger purchased for $21,070;

- A Ford pickup truck purchased for $17,196;

- A Jeep Wrangler purchased for $25,630;

- A Lincoln Navigator purchased in 2000 for $52,789;

- A Chrysler minivan purchased in 2001 for $36,697; and

- A Cadillac Escalade purchased in 2003 for $34,635.

Notes appearing on the purchase documents for each vehicle reference "Senator Fumo" as the buyer. All documents showing repairs to the vehicles list him as the customer. While the vehicles were titled to Eastern Leasing or Citizens Alliance, the evidence establishes that petitioner directed their purchase, a fact he does not contest. Citizens Alliance, usually through Eastern Leasing, paid all expenses relating to these cars and trucks, including repairs, insurance, upgrades to navigation systems, parking tickets, and payments for toll violations incurred by the vehicle drivers.

Ms. Arnao, who had served as executive director of Citizens Alliance, testified credibly on this subject at trial. She indicated that only two of the vehicles listed above were regularly used by the laborers the

**[\*67]** charity employed—the Ford Ranger and pickup truck. Both were used by Citizens Alliance's workmen to perform constituent services, with the latter being used "all the time" for that purpose before being sold to Mr. Palermo in 2004.

The Jeep Wrangler was driven primarily by Ms. Arnao. But she was the executive director of the organization at the time. Citizens Alliance issued her Form 1099–MISC, Miscellaneous Income, reflecting the value of its use, and she included that amount as income on her Form 1040, U.S. Individual Income Tax Return. Respondent has not convinced us that Ms. Arnao's use of this vehicle justifies an inclusion in petitioner's gross income.

We find that the Chrysler minivan was predominantly used by petitioner himself. The Senate provided him with a Cadillac, but he regularly drove the minivan for personal travel. Ms. Egrie testified that she never saw anyone besides petitioner or Ms. Arnao driving the minivan. Mr. Nelson (one of petitioner's drivers) and Mr. Fonseca (petitioner's butler) both thought he owned the minivan.

The evidence established that the other two cars—the Cadillac Escalade and Lincoln Navigator—were used almost exclusively by petitioner, his Senate staff, his consultants, and/or his political allies, including Frank and Christian DiCicco. The cars were rarely seen at the Citizens Alliance headquarters and were typically parked at petitioner's Philadelphia district office or his properties on the New Jersey shore. Petitioner's Senate staffers and his political consultants had essentially unfettered access to these vehicles. Staff members' use became so pervasive that Ms. Arnao had to distribute a "vehicle sign-out sheet" to all employees in the district office.

While conceding that he "permitted Citizen Alliance funds to be used to purchase" the Escalade and the Navigator, petitioner urges that he "certainly did not assume actual command over the cars or over the funds used to purchase the cars." This is a recurring theme in his Posttrial Briefs—that he should be taxable only on benefits that he personally received in the form of tangible property or cash. But the law is well established that a person is taxable, not only on property he receives himself, but on the value of property he causes to be diverted to the objects of his bounty. *See Estate of Geiger v. Commissioner*, 352 F.2d at 231; *Bailey*, 52 T.C. at 119; *Cruea*, 50 T.C.M. (CCH) at 1380–81.

**[\*68]** By providing his staff with free use of two cars, petitioner enabled them to discharge quickly and efficiently the errands and other personal tasks he incessantly assigned them. By giving his staff and political allies access to these prestige vehicles, he cemented their loyalty to him and enhanced their status as his emissaries. Petitioner is correct that the value of these intangible benefits, considered in isolation, would be hard to calculate scientifically. But the Commissioner did not act arbitrarily or unreasonably in using, as an index of the value petitioner received, the value of the property he diverted to the objects of his bounty. *See Estate of Geiger v. Commissioner*, 352 F.2d at 231.

We accordingly conclude that petitioner must include in his gross income the value that he, his staff, his political consultants, and his political allies derived from use of the Chrysler minivan, the Cadillac Escalade, and the Lincoln Navigator. Respondent calculated this value as the sum of the purchase prices for the Chrysler and the Escalade (the vehicles purchased during 2001–2005), plus the insurance, maintenance, and other costs associated with all three vehicles. Although it may have been more accurate to use the lease value of all three vehicles, rather than the purchase prices for only two, petitioner does not challenge the details of these calculations. We accordingly find the following amounts includible in his gross income:

| Year | Gross Income |
|------|-------------:|
| 2001 | $47,708 |
| 2002 | 11,038 |
| 2003 | 45,661 |
| 2004 | 12,195 |
| **Total** | **$116,602** |

6.  *Services Supplied by Citizens Alliance Staff*

Citizens Alliance employees provided petitioner with personal services connected with his residences and vacation destinations, including his Green Street home, his New Jersey beach properties, and his Riverview Farm. Citizens Alliance employees regularly hauled items to and from the beach properties and the farm. These assignments included moving a hot tub, hauling a canoe, transporting heavy farm equipment, and delivering a washer/dryer to Mr. Palermo's home in Hummelstown. Petitioner typically departed from the New Jersey shore on Sunday night, and a town ordinance prohibited leaving trash curbside until Monday evening. His solution was to direct Citizens

[*69] Alliance staff to drive its garbage trucks 62 miles to his New Jersey properties to pick up the trash generated by his weekend parties.

FBI Special Agent Humphreys quantified the value of these services on the basis of the mileage driven (using mapping software), toll expense incurred, and labor. To calculate the labor value she conservatively estimated that one employee per vehicle completed each trip, then applied Citizens Alliance's lowest hourly wage to the estimated time necessary to complete the trip. Petitioner does not dispute the details of these calculations, which we find reasonable and in several respects conservative (i.e., favorable to petitioner). These calculations produce income inclusions as follows:

| Year | Gross Income |
|------|-------------|
| 2001 | $2,662 |
| 2002 | 1,741 |
| 2003 | 4,028 |
| **Total** | **$8,431** |

The value of the services Citizens Alliance employees provided to petitioner constitutes gross income to him. The Code specifies that gross income includes income derived from services. § 61(a)(1); *see Commissioner v. Glenshaw Glass*, 348 U.S. 426, 431 (1955); Treas. Reg. § 1.61-1(a) ("Gross income includes income realized in any form, whether in money, property, or services."). Petitioner acknowledges in his Posttrial Brief that these services constituted income to him, and we sustain the income inclusions set forth in the table above.

7. *Citizens Alliance's Payments to Frank Wallace*

Petitioner engineered Senate contracts for Frank Wallace, who performed private investigation services for petitioner. *See supra* pp. 23, 57–58. During 2002 the work Mr. Wallace and his assistant performed for petitioner resulted in charges that exceeded the maximum amount payable under the Senate contract. Petitioner directed Citizens Alliance to pick up the difference.

During May 2002 Citizens Alliance paid Mr. Wallace $3,250, evidenced by checks for $1,000 and $2,250. An email from Ms. Spagna confirms that he picked up these checks at the Philadelphia district office. During petitioner's criminal trial Mr. Wallace testified that he knew of

**[\*70]** no connection between Citizens Alliance's mission and his investigative work.

Because petitioner caused diversion of these funds to the private investigator who worked exclusively for him, the amounts are includible in his gross income. We find that respondent has carried his burden of proof on this issue, which he raised in his Second Amendment to Answer. We accordingly sustain inclusion of this $3,250 in petitioner's gross income for 2002.

### 8. *Political Polling*

Citizens Alliance paid $254,560 for political polling during 2002–2003, despite the bar against charities' engaging in political campaign activity. *See* § 501(c)(3). These polls were conducted by Kiley and GS Group, which received total payments of $127,000 in 2002 and $127,560 in 2003. *See supra* pp. 29–30. Some of the payments were routed through CA Holdings, Citizens Alliance's for-profit subsidiary. In his Second Amendment to Answer respondent contends that this $254,560 is includible in petitioner's gross income. Respondent bears the burden of proof on this issue. *See* Rule 142(a).

The polls generally tested voter attitudes toward candidates that petitioner was considering endorsing. One set of polls, directed mainly to Philadelphia residents, asked whether respondents were likely to vote for certain people for mayor of Philadelphia, the city council, and other positions. A second set of polls canvassed voter preferences about Kathleen Fitzpatrick, who was seeking a seat on the Philadelphia city council. A third set tested voter attitudes toward public officials in Bucks County (an eastern Philadelphia suburb) and a Senate special election there.

Petitioner directed that this polling be conducted, and he directed Mr. Arnao to pay for it using Citizens Alliance funds. The topics of the polls had no relationship to Citizens Alliance's exempt purpose, and its conduct of such polls was prohibited under section 501(c)(3). Petitioner was the sole beneficiary of the polling results. He did not share the results with the candidates who were the subjects of the polls. Instead, he kept the results to himself and his political consultants to help them decide whom to support (or refrain from supporting) in state and local political races.

Petitioner contends that any benefit he derived from these polls was too "amorphous" to generate taxable income. We disagree. In his

[*71] Posttrial Briefs petitioner emphasizes that he was one of the most powerful political figures in Philadelphia and Pennsylvania as a whole. Political polls provide a wealth of information about candidates, and petitioner endorsed candidates as a means of amassing political power. He caused Citizens Alliance to pay for this polling to enhance his political stature, which could be tarnished if he backed the wrong horse. By causing Citizens Alliance to pay for this polling, rather than using his own PAC funds, he preserved large balances in his PACs, which helped ward off challengers.

It is possible that petitioner would have declined to incur the cost of this polling if he had had to pay the freight himself. But that does not immunize him from tax when he caused Citizens Alliance to pay for it instead. The polls did not benefit Citizens Alliance or the candidates whom the polling concerned. As the only possible beneficiary of this information, petitioner is in a poor position to contend that the polling was not worth what he caused Citizens Alliance to pay for it.

Finally, the fact that Citizens Alliance was later reimbursed for the polling expenses by Fumo for Senate and another PAC, *see supra* p. 30, does not eliminate the taxable benefit that petitioner received. He realized an economic benefit during 2002 and 2003 when he received the poll results. Repayment in a later year, when he knew he was under Federal investigation, does not retroactively eliminate gross income for 2002 and 2003. *See Morrison v. Commissioner*, T.C. Memo. 1981-617, 42 T.C.M. (CCH) 1514, 1515–16; *see also James*, 366 U.S. 213 (ruling that embezzled funds are taxable in the year of embezzlement notwithstanding repayment in a later year). In any event Citizens Alliance was reimbursed, not by petitioner himself, but by his PACs. The tax consequences of their payments would properly be reflected on their tax returns.

### 9. *Ventnor Dunes Project*

In 2001 the U.S. Army Corps of Engineers embarked on a project to protect the New Jersey shoreline by constructing dunes on Absecon Island, which includes the towns of Ventnor, Margate, and Atlantic City. Petitioner opposed this project, believing that the enlarged dunes might obstruct the ocean view from his Margate home and lower its property value. *See supra* pp. 31–32.

During 2001–2003 Citizens Alliance spent $68,645 as part of a campaign to oppose the Ventnor Dunes Project. Ms. Arnao credibly

**[\*72]** testified that petitioner got involved in this campaign because he owned a home in Margate. When asked what the Ventnor Dunes Project had to do with Citizens Alliance, she replied: "Nothing."

At petitioner's direction, Citizens Alliance paid $28,926 to Pepper Hamilton, a Philadelphia law firm, to organize entities to oppose the Ventnor Dunes Project and file on their behalf IRS applications for section 501(c)(3) status. Although these entities represented that their mission was education and community development, their true mission was to oppose dune construction that petitioner disfavored. Citizens Alliance contributed $30,000 to one of these entities, none of which was ever recognized as tax exempt by the IRS. At petitioner's direction, Citizens Alliance paid $9,720 to consultants who assisted the anti-dune organizations by handling press questions, running newspaper ads, mailing postcard flyers, and creating robocalls to residents. The IRS determined that these payments generated inclusions in petitioner's gross income as follows:

| Year | Inclusion in Gross Income |
|------|---------------------------|
| 2001 | $46,950 |
| 2002 | 21,690 |
| 2003 | 5 |
| **Total** | **$68,645** |

Petitioner contends that these funds were expended, not to benefit him personally, but to benefit his constituents who owned vacation homes on the New Jersey shore. We did not credit this testimony. Petitioner persistently endeavored to hide his involvement in the Ventnor Dunes Project. All marketing materials directed to beach residents were printed in Philadelphia by a local printer but shipped to New Jersey to avoid postmarks showing Pennsylvania as the origin. And he reprimanded a journalist who sought to connect him to the project. If petitioner were fighting on behalf of his constituents, it would be odd to obscure his involvement. In any event petitioner made no showing that any of his constituents was clamoring to prevent the construction of dunes designed to prevent damage to beachfront homes on the New Jersey shore. [6]

---

[6] Petitioner alternatively attempts to justify Citizens Alliance's payments "as one charity giving to another." But none of the anti-dune entities had any genuine nonprofit mission, and none was ever granted tax-exempt status.

[*73] Petitioner exercised his control over Citizens Alliance to divert $68,645 of its funds to mount an anti-dune campaign that he conceived and organized. We again reject his contention that any benefit he derived was too "amorphous" to generate taxable income. The question is not whether the outcome of the Ventnor Dunes Project yielded him a tangible economic benefit. It may have been a silly idea, but people often spend a lot of money promoting silly ideas. Here he got somebody else to pay for the promotion and execution of his quixotic venture. He clearly realized the economic value of the legal, consulting, and marketing services that he caused Citizens Alliance to spend on that campaign.

10.    *Travel to Cuba*

Petitioner arranged three trips to Cuba through ARCP, a charitable organization that advocated termination of the U.S. embargo of Cuba. To facilitate these trips, petitioner directed Citizens Alliance to make (and during 2001–2003 it made) payments to ARCP. These payments enabled petitioner and his friends to travel to Cuba largely free of charge.

The first trip arose when former U.S. Senator Arlen Spector invited petitioner to travel to Cuba with ARCP. To pay for this trip, Citizens Alliance transferred $12,000 to ARCP in October 2001. Petitioner asked Mr. Rubin to accompany him, and they visited Cuba for 3 days in November 2001, incurring no expenses apart from airfare.

The second trip occurred three months later. Petitioner did not intend to join this trip, but he wanted Robert Gross, a close friend, to join. Mr. Gross selected Ed Jacobs, a New Jersey attorney, to accompany him. They visited Cuba on an ARCP-sponsored trip for 3 days in February 2002, incurring no expenses apart from airfare. To pay for this trip, Citizens Alliance transferred $10,000 to ARCP in January 2002.

The third trip occurred six months later. At petitioner's invitation, two of his close friends, Carmen DiCamillo and Gerald Catania, joined this trip. They traveled to Cuba with ARCP from September 27 to 29, 2002, incurring no expenses apart from airfare and hotel costs. To pay for this trip, Citizens Alliance (through CA Holdings) transferred $7,000 to ARCP in September 2002. Although petitioner arranged no further trips to Cuba, Citizens Alliance made additional payments to ARCP after the third trip, transferring $5,000 in November 2002 and

[*74] another $5,000 in September 2003. The evidence at trial did not establish the purpose of these two payments.

Apart from petitioner, the travelers on these trips had no knowledge that Citizens Alliance was paying their way. The trip itineraries included cultural experiences and a few meetings with Cuban government officials, but no activities with any obvious connection to Citizens Alliance's mission. At trial Ms. Arnao could not identify any rational connection between these trips and Citizens Alliance's accomplishment of its tax-exempt purpose. Petitioner contended that the trips could strengthen trading relationships for Philadelphia's shipping industry. Given the U.S. embargo against trade with Cuba, that argument did not seem persuasive.

We conclude that petitioner is taxable on the $12,000 that Citizens Alliance paid to enable him and Mr. Rubin, one of his principal political fundraisers, to travel to Cuba largely cost free. But we are not convinced that petitioner derived any real economic benefit from the second and third trips. The beneficiaries of those trips were Messrs. Catania, Jacobs, Gross, and DiCamillo. All three were close personal friends of petitioner. Mr. Catania was a florist who supplied flowers for petitioner's annual gala and other events. Mr. Gross had known petitioner for 40 years and regularly socialized with him at the New Jersey shore, where Mr. Gross also had a home. Mr. DiCamillo, a corporate executive in Philadelphia, was likewise a close personal friend with whom petitioner regularly socialized.

As best we can tell from the trial evidence, petitioner found his trip to Cuba an eye-opening experience, and he wanted several of his closest friends to share that experience. We did not discern any political benefit or other quid pro quo he realized by facilitating these trips, apart from his friends' gratitude. While we agree with respondent that Citizens Alliance should not have paid for these trips, we find that petitioner did not derive a cognizable economic benefit from the payments. We accordingly conclude that he is required to include in gross income only the $12,000 paid in 2001 for the first trip, which indisputably benefited him personally.

IV.   *Excise Tax Liability*

    A.    *Governing Statutory Structure*

Section 4958 is captioned "Taxes on excess benefit transactions." Section 4958(c)(1)(A) defines an "excess benefit transaction" as "any

[*75] transaction in which an economic benefit is provided by an applicable tax-exempt organization directly or indirectly to or for the use of any disqualified person if the value of the economic benefit provided exceeds the value of the consideration (including the performance of services) received for providing such benefit."

Congress enacted section 4958 not to collect revenue but to "deter insiders of an organization from using their positions of influence to receive unreasonable compensation." *See U.S. Department of the Treasury's Proposals to Improve Compliance by Tax-Exempt Organizations: Hearing Before the Subcomm. on Oversight of the H. Comm. on Ways & Means*, 103d Cong. 15 (1994) (statement of Leslie B. Samuels, Assistant Secretary for Tax Policy). "Before the enactment of section 4958, if an organization . . . did not comply with the rules regarding tax exemption, the Commissioner's only recourse was to revoke the organization's exemption." *Caracci v. Commissioner*, 118 T.C. 379, 414 (2002), *rev'd per curiam*, 456 F.3d 444 (5th Cir. 2006). Because revocation was a harsh punishment, and because that punishment fell "on the organization[] rather than benefited individuals," Congress recognized the need for "intermediate sanctions." Boris I. Bittker & Lawrence Lokken, *Federal Taxation of Income, Estates & Gifts* ¶ 100.5 (2025), Westlaw FTXIEG. Section 4958, like other intermediate sanctions, is intended to deter malfeasance and incentivize insiders to restore the charity to the status quo ante. *See* Bittker & Lokken, *supra*, ¶ 100.5.

An "applicable tax-exempt organization" is defined to include an organization described in section 501(c)(3) and exempt from tax under section 501(a). *See* § 4958(e)(1). Citizens Alliance was an "applicable tax-exempt organization" during 2002–2004. A "disqualified person" is defined to include "any person who was, at any time during the 5-year period ending on the date of [the excess benefit] transaction, in a position to exercise substantial influence over the affairs of the organization." § 4958(f)(1)(A). We have held that petitioner was a "disqualified person" of Citizens Alliance at all relevant times. *Fumo*, 121 T.C.M. (CCH) at 1478.

As the statute makes clear, an excess benefit transaction may occur when a charity provides a benefit "directly or indirectly to or for the use of" any disqualified person. § 4958(c)(1)(A). An excess benefit transaction may be accomplished indirectly when a charity confers a benefit on a disqualified person "through a controlled entity or an intermediary." Treas. Reg. § 53.4958-4(a)(2)(i). The same is true where a disqualified person derives an indirect benefit from the diversion of charitable

[*76] funds to a third party. *See, e.g., Ononuju v. Commissioner*, T.C. Memo. 2021-94, 122 T.C.M. (CCH) 109, 113 (holding that a taxpayer engaged in an excess benefit transaction when she diverted a charity's funds to pay for her children's insurance costs); *Farr v. Commissioner*, T.C. Memo. 2018-2, 115 T.C.M. (CCH) 1003, 1004, 1006 (holding that a taxpayer engaged in an excess benefit transaction when she diverted a charity's funds to pay her son's boarding school tuition), *aff'd*, 738 F. App'x 969 (10th Cir. 2018).

Section 4958(a)(1) imposes on each excess benefit transaction an excise tax "equal to 25 percent of the excess benefit" and provides that this tax "shall be paid by any disqualified person referred to in subsection (f)(1) with respect to such transaction." If the excess benefit transaction is not corrected timely, the disqualified person is liable for a second-tier tax equal to 200% of the excess benefit. *See* § 4958(b). The second-tier tax is no longer at issue here. *See supra* note 3.

### B.    *Period of Limitations*

Whether the section 4958(a) excise tax is imposed on the charity or its disqualified person, the period of limitations is determined with reference to the tax return required to be filed by the charity. § 6501(*l*)(1); Treas. Reg. § 53.4958-1(e)(3). Section 6501(a) generally requires the IRS to assess a tax within three years after the return was filed.

The Notice of Deficiency in the excise tax case was issued on May 10, 2013, well after the three-year period of limitations had expired for 2004, the last tax year at issue. However, section 6501(c)(3) provides that, "[i]n the case of failure to file a return, the tax may be assessed . . . at any time." Citizens Alliance filed no return for 2003 or 2004. Accordingly, no period of limitations applies for those years.

Citizens Alliance filed a return for 2002 on May 18, 2003. Section 6501(c)(2) provides that, "[i]n case of a willful attempt in any manner to defeat or evade tax imposed by this title (other than tax imposed by subtitle A or B), the tax may be assessed . . . at any time." Numerous excise taxes, including the tax imposed by section 4958, are imposed by title 26, subtitle D. Respondent's ability to collect an excise tax for 2002 thus depends on whether petitioner engaged in a willful attempt to defeat or evade the tax.

We find that he did. At petitioner's direction, Citizens Alliance paid $127,000 for political polling during 2002. *See supra* pp. 29–30. As

[*77] a public charity, Citizens Alliance was absolutely prohibited from engaging in such political activity. *See* § 501(c)(3). When its accountants inquired about these expenses, Ms. Arnao at petitioner's instruction falsely replied that the polls had been conducted to survey community attitudes and consisted of "neighborhood questions." The expenses were accordingly misreported on the 2002 return as having been permissibly incurred for "community development consulting."

Section 4955 imposes an excise tax on "political expenditures of section 501(c)(3) organizations." *See* § 4955(a)(1) (imposing a 10% excise tax on the charity). By concealing the true nature of the political polling expenses, petitioner and Ms. Arnao willfully attempted "to defeat or evade tax imposed" by section 4955. *See* 6501(c)(2).

Section 4958 imposes an excise tax, payable by the disqualified person and the organization manager, on "excess benefit transaction[s]." *See* § 4958(a)(1) (imposing a 25% tax on disqualified person) and (2) (imposing a 10% tax on the management). By concealing that the political polling was conducted for petitioner's benefit at his direction, he and Ms. Arnao willfully attempted "to defeat or evade tax imposed by" section 4958. *See* § 6501(c)(2).

For these reasons, petitioner and Ms. Arnao were convicted on four counts of aiding and assisting in the filing of a false tax return by Citizens Alliance for 2002. *See* § 7206(2). That conviction establishes that they engaged in a "willful attempt . . . to defeat or evade tax imposed by [subtitle D]." *See* § 6501(c)(2). The excise tax for 2002, as for 2003 and 2004, may thus be assessed "at any time." *Ibid.*

C.    *Analysis*

"The term 'excess benefit transaction' means any transaction in which an economic benefit is provided by an applicable tax-exempt organization . . . [to] any disqualified person if the value of the economic benefit provided exceeds the value of the consideration (including the performance of services) received for providing such benefit." § 4958(c)(1)(A). To ascertain petitioner's total excise tax liability, we must first determine the aggregate "economic benefits" that Citizens Alliance provided to him. We must then subtract from that total any "consideration (including the performance of services)" that Citizens Alliance received in exchange for providing such benefits.

**[\*78]**  1.  *"Economic Benefits"*

We have held that Citizens Alliance provided petitioner with substantial "economic benefits" during 2001–2005 and that the value of these benefits is includible in his gross income. *See supra* pp. 61–74. Because the IRS determined deficiencies in excise tax only for 2002–2004, the economic benefits petitioner received during those years are the relevant benefits for section 4958 purposes. (We thus ignore, for example, the $12,000 benefit petitioner received in 2001 when Citizens Alliance paid for his trip to Cuba.) Tabulating the results of our analysis above, we find that petitioner during 2002–2004 received $483,890 in "economic benefits" from Citizens Alliance, as follows:

| *Benefit* | *2002* | *2003* | *2004* | *Total* |
|---|---|---|---|---|
| Tools | $13,751 | $19,721 | $3,690 | $37,162 |
| Consumer Goods | 10,653 | 3,848 | 508 | 15,009 |
| Farm Equipment | – | 68,659 | – | 68,659 |
| Cell Phone Expense | 3,982 | 2,245 | 2,665 | 8,892 |
| Vehicles | 11,038 | 45,661 | 12,195 | 68,894 |
| Personal Services | 1,741 | 4,028 | – | 5,769 |
| Frank Wallace Payments | 3,250 | – | – | 3,250 |
| Political Polling | 127,000 | 127,560 | – | 254,560 |
| Ventnor Dunes | 21,690 | 5 | – | 21,695 |
| Travel to Cuba | – | – | – | -0- |
| **Total** | $193,105 | $271,727 | $19,058 | $483,890 |

2.  *"Consideration Received"*

In determining the excise tax liability, the economic benefits calculated above are reduced by "the value of [any] consideration (including the performance of services) received [by the charity] for providing such benefit[s]." § 4958(c)(1)(A). "For purposes of the preceding sentence, an economic benefit shall not be treated as consideration for the performance of services unless such organization *clearly indicated* its intent to so treat such benefit." *Ibid.* (emphasis added).

As a rule, a charity "is treated as clearly indicating its intent to provide an economic benefit as compensation for services only if [it] provides written substantiation that is contemporaneous with the transfer of the economic benefit." Treas. Reg. § 53.4958-4(c)(1). In the absence

**[\*79]** of such contemporaneous substantiation, "any services provided by the disqualified person will not be treated as provided in consideration for the economic benefit." *Ibid.*

The "contemporaneous substantiation" requirement can be satisfied by timely reporting. *Id.* subpara. (3)(i). Timely reporting occurs if the charity reports the economic benefits provided to the disqualified person as compensation on Form W–2 or Form 1099 before the IRS commences an examination. *Id.* subdiv. (i)(A)(*1*). Timely reporting also occurs if the disqualified person reports the economic benefits on an original or amended Form 1040 before the IRS commences an examination. *Id.* subdiv. (i)(A)(*2*).

Citizens Alliance did not report any economic benefits provided to petitioner as compensation on Form W–2 or Form 1099. Indeed, Citizens Alliance filed no return for 2003 or 2004 and explicitly stated on its 2002 return that it did not "engage in any section 4958 excess benefit transaction during the year." And petitioner did not report any economic benefits received from Citizens Alliance as income on Form 1040 or Form 4720. Petitioner therefore cannot show that the "contemporaneous substantiation" requirement was met by timely reporting.

The "contemporaneous substantiation" requirement can also be satisfied by "other written contemporaneous evidence." *Id.* subdiv. (ii). Such evidence must establish that "the appropriate decision-making body [of the charity] or an officer authorized to approve compensation approved a transfer as compensation for services in accordance with established procedures." *Ibid.* Examples of such evidence include "[a]n approved written employment contract" or other documentation showing that "an authorized body approved the transfer as compensation for services." *Id.* subdiv. (ii)(A) and (B).[7]

Petitioner had no employment contract with Citizens Alliance. And he has offered no other written contemporaneous evidence to establish that Citizens Alliance "clearly indicated its intent" to treat the economic benefits it provided to him during 2002–2004 as "consideration for services rendered." § 4958(c)(1)(A). In the absence of contemporaneous substantiation, "any services provided by the disqualified person

---

[7] "Contemporaneous substantiation" may also include written evidence that the charity had "a reasonable belief" that the economic benefits it provided to the disqualified person were "nontaxable benefits," such as contributions to a qualified retirement plan. *See* Treas. Reg. § 53.4958-4(c)(2), (3)(ii)(C). That provision has no possible application here.

**[\*80]** will not be treated as provided in consideration for the economic benefit." Treas. Reg. § 53.4958-4(c)(1). [8]

In sum, petitioner is foreclosed from contending that the value of the services he rendered to Citizens Alliance should be offset against the value of the economic benefits it provided to him. The entirety of the economic benefits he received during 2002–2004 thus constituted excess benefits subject to the 25% first-tier excise tax prescribed by section 4958(a)(1).

### 3. *Petitioner's Arguments*

In contending that he received no excess benefits from Citizens Alliance, petitioner advances essentially the same arguments he urged when contending that there should be no inclusions in his gross income. He insists that he derived no "tangible economic benefit" from the charity's outlays, apart from the tools and consumer goods he caused it to buy for him. The cell phone and vehicle expenses, he says, simply enabled staffers "to perform their jobs more efficiently." The sole beneficiaries of the Ventnor Dunes expenses were allegedly the people who "resided in Ventnor." The farm equipment and personal services were supposedly "perks and gifts" to which he was entitled because of the work he did for the organization. According to petitioner, the political polling expenses merely "informed [him] on pivotal community decisions," generating "political capital" of which "the ultimate beneficiaries . . . were his constituents." Aside from the tools and consumer goods, petitioner insists, "there is no evidence that his personal wealth increased, by any measure, as a result of [Citizens Alliance's] expenditures."

Reduced to its essentials, petitioner's argument is that any benefits he derived from Citizens Alliance were exempt from excise tax because they were too amorphous and indirect to constitute "income" for Federal tax purposes. *See* Petr.'s Seriatim Opening Br. 321 (urging that "the scope of the term [economic benefit] stretches no further than does

---

[8] The regulations provide an exception whereby an organization will be treated as having "clearly indicated its intent" to provide a benefit as compensation for services if "reasonable cause" is shown for its failure to report the benefit as the Code requires. *See* Treas. Reg. § 53.4958-4(c)(3)(i)(B). To qualify for this exception, it must be established that "there were significant mitigating factors with respect to [the organization's] failure to report" or that the failure "arose from events beyond [its] control." *Ibid.* Petitioner has not relied on this exception at any point in this litigation, and he could not plausibly do so. Citizens Alliance filed no tax return at all for 2003 or 2004, and the district court in the criminal case determined that its 2002 return was "fraudulent or [was] false as to [a] material matter." *See* § 7206(2).

[*81] the term 'income'"). We have already rejected his contention that the benefits he received were too amorphous to constitute income. *See supra* pp. 70–71, 73. And his "perks and gifts" argument is a nonstarter because he produced no contemporaneous substantiation that Citizens Alliance "clearly indicated its intent" to treat these economic benefits as consideration for the performance of services. *See* § 4958(c)(1)(A). He has not challenged the methods of calculation employed by the IRS, which we have found to be conservative in several respects. We accordingly hold that he is liable for the 25% first-tier excise tax on the $483,890 of excess benefits he received.[9]

## V. *Penalties and Additions to Tax*

### A. *Civil Fraud Penalty*

#### 1. *Supervisory Approval*

Section 6751(b)(1) provides that "[n]o penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination." As a threshold matter, respondent must show that he complied with section 6751(b)(1). *See Chai v. Commissioner*, 851 F.3d 190, 221 (2d Cir. 2017) (ruling that "compliance with § 6751(b) is part of the Commissioner's burden of production" under section 7491(c)), *aff'g in part, rev'g in part* T.C. Memo. 2015-42.

In *Belair Woods, LLC v. Commissioner*, 154 T.C. 1, 14–15 (2020), we explained that the "initial determination" of a penalty assessment is typically embodied in a letter "by which the IRS formally notifie[s] [the taxpayer] that the Examination Division ha[s] completed its work and . . . ha[s] made a definite decision to assert penalties." Once the Commissioner introduces evidence sufficient to show written supervisory approval, the burden shifts to the taxpayer to show that the approval was untimely, i.e., "that there was a formal communication of the penalty [to the taxpayer] before the proffered approval" was secured. *Frost v. Commissioner*, 154 T.C. 23, 35 (2020).

---

[9] Section 4962 provides for nonassessment or abatement of the first-tier tax "[i]f it is established to the satisfaction of the Secretary" that the taxable event "was due to reasonable cause and not to willful neglect" and "was corrected within the correction period for such event." § 4962(a). Petitioner has not attempted to rely on this provision at any point in this litigation, and we thus consider it no further.

**[\*82]** Petitioner does not dispute that the IRS secured timely supervisory approval for the fraud penalties. In any event, respondent has produced the Form 4549 by which RA Kelly recommended assertion of those penalties. RA Kelly's immediate supervisor, Mr. Doletski, signed that form on October 3, 2012. The proposal to assert fraud penalties was communicated to petitioner by the 30-Day Letter dated October 3, 2012, with an attached Form 4549 showing the penalty calculation. Respondent has thus met his burden of production by showing timely approval. *See ibid.*

### 2. *Existence of Fraud*

"If any part of any underpayment of tax required to be shown on a return is due to fraud," section 6663(a) imposes a penalty of 75% of the portion of the underpayment attributable to fraud. Respondent has the burden of proving fraud, and he must prove it by clear and convincing evidence. *See* § 7454(a); Rule 142(b); *Richardson v. Commissioner*, T.C. Memo. 2006-69, 91 T.C.M. (CCH) 981, 996, *aff'd*, 509 F.3d 736 (6th Cir. 2007).

To sustain his burden, respondent must establish two elements: (1) that there was an underpayment of tax for each year at issue and (2) that at least some portion of the underpayment for each year was due to fraud. *See Hebrank v. Commissioner*, 81 T.C. 640, 642 (1983). Where the Commissioner determines fraud penalties for multiple tax years, his burden of proving fraud "applies separately for each of the years." *Vanover v. Commissioner*, T.C. Memo. 2012-79, 103 T.C.M. (CCH) 1418, 1420 (quoting *Temple v. Commissioner*, T.C. Memo. 2000-337, 80 T.C.M. (CCH) 611, 618, *aff'd*, 62 F. App'x 605 (6th Cir. 2003)).

If the Commissioner proves that some portion of an underpayment for a particular year was attributable to fraud, then "the entire underpayment shall be treated as attributable to fraud" unless the taxpayer shows, by a preponderance of the evidence, that the balance was not so attributable. § 6663(b). Respondent has met his burden to show an underpayment of tax for each year at issue. We must determine whether he has established that at least some portion of each underpayment was due to fraud.

Fraud is intentional wrongdoing designed to evade tax believed to be owing. *Neely*, 116 T.C. at 86. The existence of fraud is a question of fact to be resolved upon consideration of the entire record. *Estate of Pittard v. Commissioner*, 69 T.C. 391, 400 (1977). Fraud is not to be

**[\*83]** presumed or based upon mere suspicion. *Petzoldt*, 92 T.C. at 699–700. But because direct proof of a taxpayer's intent is rarely available, fraudulent intent may be established by circumstantial evidence. *Id.* at 699. The Commissioner satisfies his burden of proof by showing that "the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes." *Parks v. Commissioner*, 94 T.C. 654, 661 (1990). The taxpayer's entire course of conduct may be examined to establish the requisite intent, and an intent to mislead may be inferred from a pattern of conduct. *Webb v. Commissioner*, 394 F.2d 366, 379 (5th Cir. 1968), *aff'g* T.C. Memo. 1966-81; *Stone v. Commissioner*, 56 T.C. 213, 224 (1971).

Circumstances that may indicate fraudulent intent, often called "badges of fraud," include but are not limited to (1) understating income, (2) keeping inadequate records, (3) giving implausible or inconsistent explanations of behavior, (4) concealing income or assets, (5) failing to cooperate with tax authorities, (6) engaging in illegal activities, (7) supplying incomplete or misleading information to a tax return preparer, (8) providing testimony that lacks credibility, (9) filing false documents (including false tax returns), (10) failing to file tax returns, and (11) dealing in cash. *See Maretta v. Commissioner*, 168 F. App'x 528, 531 (3d Cir. 2006), *aff'g* T.C. Memo. 2004-128; *Bradford v. Commissioner*, 796 F.2d 303, 307–08 (9th Cir. 1986), *aff'g* T.C. Memo. 1984-601; *Parks*, 94 T.C. at 664–65; *Recklitis v. Commissioner*, 91 T.C. 874, 910 (1988); *Morse v. Commissioner*, T.C. Memo. 2003-332, 86 T.C.M. (CCH) 673, 675, *aff'd*, 419 F.3d 829 (8th Cir. 2005). No single factor is dispositive, but the existence of several factors "is persuasive circumstantial evidence of fraud." *Vanover*, 103 T.C.M. (CCH) at 1420–21.

Several of these factors have no application here. "Dealing in cash" has no relevance to petitioner's income tax case given the nature of the unreported income. And petitioner did file an individual income tax return for each year at issue. But we conclude that numerous badges of fraud show that he acted with fraudulent intent during 2001–2005.

a.   *Understating Income*

A pattern of substantially understating income for multiple years is strong evidence of fraud, particularly if the understatements are not satisfactorily explained. *See id.* at 1421. Petitioner understated his income by well over $2 million in the aggregate during the years at issue. The volume of unreported income for each year was large relative to the

**[\*84]** income that he actually reported, which ranged between $500,000 and $1.7 million.

In the criminal case the total loss to the Senate was calculated as $2,517,274, and petitioner was held to be responsible for 100% of that loss. The total loss to Citizens Alliance was ultimately calculated as $1,566,528, and the Third Circuit stated that petitioner "reaped approximately 96% of the gains or benefits arising out of the [Citizens Alliance] fraud." *Fumo*, 513 F. App'x at 220. The losses inflicted on the Senate and Citizens Alliance do not translate dollar-for-dollar into unreported income for petitioner. But given the source of the income, the scale and persistence of the fraud, and the pattern of underreporting, the first badge of fraud clearly cuts against petitioner.

b. *Keeping Inadequate Records*

Petitioner failed to keep adequate records of his income during each year at issue. *See Meier v. Commissioner*, 91 T.C. 273, 302 (1988) (holding that a taxpayer's inadequate recordkeeping evidenced an intent "to conceal information" from the IRS). And he actively participated in the destruction of documents during 2003–2005. Because of the computer wiping programs he orchestrated, FBI special agents had to engage in a meticulous reconstruction of his income by issuing subpoenas to vendors and other parties. Their work revealed that hundreds of thousands of dollars of expenditures that benefited petitioner (directly or indirectly) lacked any trace in his books and records. His destruction of documents ultimately led to his conviction on 32 counts of obstruction of justice or conspiracy to obstruct justice. This behavior constitutes strong evidence of fraudulent intent, particularly during tax years 2003–2005.

c. *Giving Implausible Explanations*

Petitioner offered to the IRS and the Court several implausible and inconsistent explanations about his income and assets. At trial he argued that his staff volunteered to perform a myriad of personal tasks for him despite their unanimous testimony to the contrary. *See supra* pp. 50–51. He advanced the wholly implausible argument that benefits he received from Citizens Alliance were "perks and gifts" and should be ignored because they "were minuscule in comparison" to the donations he secured on behalf of the charity. As a bank chairman, an attorney, and a state senator responsible for negotiating the state budget, he must have known that these theories were untenable.

**[\*85]**                    d.        *Concealing Income or Assets*

A willful attempt to evade tax may be inferred from a taxpayer's concealment of income or assets. *Spies v. United States*, 317 U.S. 492, 499 (1943). Petitioner intentionally concealed substantial amounts of income that he extracted from the Senate and Citizens Alliance. He submitted false documents to the chief clerk of the Senate to conceal his hiring of Senate employees to perform personal services for him. He caused the Senate to execute contracts with five "consultants," at a cost in excess of $1 million, concealing that these individuals would work almost exclusively for him. *See supra* pp. 23–26, 57–61. On forms that he was required to file under Pennsylvania law, he reported receiving no personal goods or services from any organization, which included the Senate and Citizens Alliance. He amended those forms only after he was under Federal investigation, when he knew the jig was up.

Petitioner also concealed income and assets through the structure he adopted for Citizens Alliance, with CA Holdings as a for-profit subsidiary and seven second-tier subsidiaries beneath it. The trial court in the criminal case found that these entities, which had no employees, were sham corporations "designed to hide the activities of Citizens Alliance that were not in conformity with its status as a section 501(c)(3) corporation, such as the purchase of cars for the personal use of Fumo and his staff." *United States v. Fumo*, No. 06-319, 2009 WL 1688482, at \*18 (E.D. Pa. June 17, 2009). Apart from defraying the cost of vehicles and farm equipment used by petitioner, CA Holdings at his direction paid for political polling expenses, costs incident to the Ventnor Dunes Project, and the cost of acquiring consumer goods petitioner desired. By placing these expenses on the books of a for-profit corporation, petitioner concealed that he and his political allies were the true beneficiaries.

                    e.        *Failure to Cooperate with Tax Authorities*

Failure to cooperate with tax authorities is a badge of fraud because it reveals an ongoing effort to conceal the taxpayer's antecedent wrongdoing. *Porter v. Commissioner*, T.C. Memo. 2015-122, 110 T.C.M. (CCH) 1, 14. Here, the initial investigation into petitioner's wrongdoing was conducted, not by an IRS revenue agent, but by the FBI and the Department of Justice. As determined in the criminal trial, petitioner engaged in obstruction of justice by directing a massive wiping of computers in his Philadelphia district office, his Harrisburg office, and Citizens Alliance. He persisted in this obstructive behavior even after negotiations with the U.S. Attorney's Office in January 2005 concerning

**[\*86]** the maintenance of digital evidence. He plainly failed to cooperate with the authorities who were investigating the crimes that generated his unreported income.

Petitioner argues that this badge of fraud "simply does not apply" because respondent has not provided a "single example of Petitioner failing to cooperate with IRS agents." We disagree. The IRS did not commence its civil examination until petitioner's criminal conviction had become final following the termination of all appeals. By that point, petitioner's misappropriation of funds from the Senate and Citizens Alliance had been conclusively established. Because his antecedent wrongdoing had already been determined—and because the relevant digital evidence had already been destroyed—there was not much he could hope to conceal by failing to cooperate with the IRS revenue agents who conducted the civil examination. Cooperation with tax authorities has less salience as an exculpatory factor when the cat is already out of the bag.

We commend petitioner for adjusting his behavior during the pendency of these cases. But that conduct does not purge the fraudulent intent evidenced by his efforts to obstruct the Justice Department's original investigation. *Cf. Badaracco v. Commissioner*, 464 U.S. 386, 394 (1984) (holding that the filing of a proper amended return does not purge the fraud evidenced by the filing of a fraudulent original return); *Porter*, 110 T.C.M. (CCH) at 22 ("We cannot discount [past] months of uncooperative behavior that gives insight into petitioner's intent [to evade tax] . . . ."). Petitioner failed to cooperate with the authorities investigating his wrongdoing during 2003–2005, when he evidently believed he could profit from such concealment. That conduct constitutes persuasive circumstantial evidence of fraud.

f.     *Supplying Incomplete or Misleading Information to a Tax Return Preparer*

Petitioner received from his return preparer each year a "tax organizer" in which he reported many categories of income, such as rental proceeds, investment income, and wages. But he provided his accountants during 2001–2005 with no information relating to the benefits he misappropriated from the Senate and Citizens Alliance. His claim that he had no idea such amounts might be taxable to him can only be characterized as willful blindness.

Even more telling was petitioner's provision of false information to the firm that prepared Citizens Alliance's returns. During 2002 and

[*87] 2003 Citizens Alliance paid (directly or through its for-profit subsidiary) $254,560 for political polling. As a section 501(c)(3) charity, it was prohibited from engaging in such political activity. When its accountants inquired about these outlays, Ms. Arnao at petitioner's instruction replied that the polls had been conducted to survey community attitudes and consisted of "neighborhood questions." By providing this false information to the return preparer, petitioner concealed that he had received unreported income from political polling that directly benefited him. *See supra* pp. 30, 70–71.

Petitioner at trial testified that he provided false information to the return preparer to safeguard Citizens Alliance's tax-exempt status. We found that explanation to be self-serving and non-exculpatory. Misleading an accountant to preserve the tax-exempt status of a charity from which he was extracting improper benefits is a badge of fraud. Indeed, petitioner was convicted of willfully aiding or assisting in the filing of a false return by Citizens Alliance for tax year 2002.

### g.      *Engaging in Illegal Activities*

During 2001–2005 petitioner siphoned millions of dollars in goods and services from the Senate and Citizens Alliance. In March 2009 he was convicted on 137 counts of criminal activity. This criminal activity was the source of the unreported income at issue here. His illegal activities are definite badges of fraud. *See Catlett v. Commissioner*, T.C. Memo. 2021-102, 122 T.C.M. (CCH) 147, 152; *Le v. Commissioner*, T.C. Memo. 2020-27, 119 T.C.M. (CCH) 1165, 1173.

### h.      *Filing False Documents*

Petitioner filed false income tax returns for 2001–2005, omitting millions of dollars of gross income. He supplied (or caused to be supplied) false documents to the chief clerk of the Senate to justify excessive salaries for his staff. He knowingly caused the Senate to execute consulting contracts that misrepresented the services that Messrs. Wallace, Cain, Press, Palermo, and Rubin would perform. And he falsely certified to the State of Pennsylvania that he had received no personal goods and services from any organization (which included the Senate and Citizens Alliance).

We conclude that respondent has established by clear and convincing evidence that the underpayments of income tax for 2001–2005 were attributable to fraud. Petitioner did not establish, "by a preponderance of the evidence," that any identifiable portions of the

**[*88]** underpayments were not attributable to fraud. *See* § 6663(b). We thus sustain respondent's determinations that the income tax Notice of Deficiency for 2001–2005 was timely under section 6501(c)(1) and that petitioner is liable for civil fraud penalties for 2001–2005 on the underpayments of tax determined in this Opinion.

B.     *Additions to Tax for Failure to File*

Section 6651(a)(1) provides for an addition to tax of 5% of the tax required to be shown on a return for each month or fraction thereof for which there is a failure to file the return, not to exceed 25% in toto. Respondent determined that petitioner, for tax years 2002–2004, was required to file a return on Form 4720 reporting the excess benefit transactions in which he and Citizens Alliance participated. Because petitioner did not file such returns, the IRS determined additions to tax under section 6651(a)(1) for each year.

Tax-exempt organizations are required to file Form 4720 to report liability for various excise taxes, including taxes imposed for political expenditures under section 4955 and excess benefit transactions under section 4958. *See* Treas. Reg. § 53.6011-1(b) (imposing this filing requirement). Citizens Alliance did not file Form 4720 for any year at issue. The IRS concluded that petitioner—as the "disqualified person" who participated in the excess benefit transactions—was therefore required to file Form 4720 for each period. *See ibid.* (providing that "[e]very person" liable for tax imposed by section 4958(a) shall file such a return); 2002 Instructions for Form 4720, at 2 ("[D]isqualified persons . . . who owe tax under Chapter 41 or 42 . . . [and] do not sign the return of the . . . organization, must file a separate return on Form 4720 showing the tax owed and the name of the . . . organization for which [they] owe tax.").

In *Ononuju*, 122 T.C.M. (CCH) at 114–15, we held that additions to tax may apply when a disqualified person fails to file Form 4720 reporting excess benefit transactions. "Section 6011(a) provides that, '[w]hen required by regulations prescribed by the Secretary any person made liable for any tax imposed by this title shall make a return or statement according to the forms and regulations prescribed by the Secretary.'" *Ibid.* The Secretary has prescribed regulations under section 6011 mandating that "[e]very person liable for tax imposed by section[] . . . 4958(a) . . . shall file an annual return on Form 4720." Treas. Reg. § 53.6011-1(b). "Because this filing requirement was promulgated under the authority of section 6011(a)," petitioner's failure to file Form 4720

**[*89]** may subject him to liability for an addition to tax. *See Ononuju*, 122 T.C.M. (CCH) at 115; *cf. Janpol v. Commissioner*, 102 T.C. 499, 500 (1994) (ruling that an addition to tax may apply for failure to file Form 5330 reporting section 4975 excise tax on prohibited transactions), *supplementing* 101 T.C. 518 (1993).

To avoid liability for this addition to tax, petitioner must demonstrate that his failure to file Form 4720 was "due to reasonable cause and not due to willful neglect." *See* § 6651(a)(1). Reasonable cause exists "if the taxpayer exercised ordinary business care and prudence but, nevertheless, was unable to file the return within the time prescribed by law." *Niedringhaus v. Commissioner*, 99 T.C. 202, 221 (1992). "[C]ircumstances considered to constitute reasonable cause arise as a result of factors beyond a taxpayer's control," such as "postal delays, timely filing of a return with the wrong office, death or serious illness of the taxpayer or a member of his immediate family, [or] the taxpayer's unavoidable absence from the United States." *Paschall v. Commissioner*, 137 T.C. 8, 21 (2011).

"A taxpayer's belief that no return is required in itself is not sufficient to show that the failure to file was due to reasonable cause." *Niedringhaus*, 99 T.C. at 221. Similarly, where no return whatever is filed, "reliance on a tax adviser to prepare the return does not constitute reasonable cause." *Paschall*, 137 T.C. at 22 n.16.

The Form 4720 is admittedly an exotic species: The obligation to file this return—unlike the obligation to file (say) Form 1040—is far from common knowledge. Petitioner maintains that he had reasonable cause for his failure to file because he lacked any concept of the terms "constructive income" or "disqualified person." He assertedly had "no inkling that he may have obtained a taxable . . . benefit" during the years at issue.

We are not persuaded. Petitioner was an attorney, a bank chairman, and a highly sophisticated actor. He caused his Senate staff to create Citizens Alliance as a tax-exempt charity, and it was operated out of his office. He is charged with knowledge of the basic rules governing the operation of public charities.

The core principle governing public charities is that their expenditures must serve a charitable, not a private, purpose. During 2002–2004 petitioner caused Citizens Alliance to pay more than $100,000 for tools he used to stock his personal tool sheds, for food and beverages he

[*90] served to guests at his weekly summer barbeques, for heavy equipment he used on his farm, and for vehicles he drove or allowed his political allies to drive. He caused Citizens Alliance to pay more than $250,000 for political polling he knew was improper, as shown by his efforts to mislead the charity's accountants about these outlays.

These violations were not subtle, and the dollar amounts involved were not trivial. We find wholly unpersuasive petitioner's assertion that he had "no inkling that he may have obtained a taxable . . . benefit" from these outlays by the charity he created. In any event, assuming arguendo that he did not understand that the excess benefit transactions needed to be reported on an excise tax return, "[i]gnorance of the law . . . does not amount to reasonable cause." *See Ononuju*, 122 T.C.M. (CCH) at 115 (quoting *Rayhill v. Commissioner*, T.C. Memo. 2013-181, 106 T.C.M. (CCH) 100, 101).[10]

To reflect the foregoing,

*Decisions will be entered under Rule 155.*

---

[10] The record indicates that Citizens Alliance was advised to file Form 4720 during a phone conference in January 2005, and this recommendation was passed along to Ms. Arnao in a client letter dated February 3, 2005. Given petitioner's extensive involvement in the affairs of Citizens Alliance, we find it likely that this advice was relayed to him. At the very least, therefore, petitioner likely had actual knowledge that Form 4720 had to be filed for tax year 2004.